Filed 3/27/20

**CERTIFIED FOR PARTIAL PUBLICATION\***

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| THE PEOPLE,<br><br>      Plaintiff and Respondent,<br><br>v.<br><br>RON COWAN,<br><br>      Defendant and Appellant. | A156253<br><br>(City & County of San Francisco Super. Ct. Nos. 229497/18005814, 229498/18010055) |

       Ron Cowan appeals from a final judgment and sentence entered after a guilty plea, preceded by the denial of a motion to suppress evidence. The grounds for appeal are three-fold. First, Cowan argues that his detention in a traffic stop prior to his arrest violated the Fourth Amendment for lack of reasonable suspicion to detain. Second, Cowan challenges as an abuse of discretion a 16-month jail term imposed upon him as part of a grant of probation—a so-called "hammer," to which he consented as part of his plea— for his failures to appear at sentencing and at a probation interview appointment. Third, Cowan attacks the court operations and court facilities assessments and the minimum restitution fine imposed on him over his

---

      \* Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, this opinion is certified for publication with the exception of parts II and III of the lead opinion.

1

inability-to-pay objection under *People v. Dueñas* (2019) 30 Cal.App.5th 1157 (*Dueñas*).

In the unpublished portion of this opinion, we reject Cowan's argument that he was detained in violation of the Fourth Amendment. We also reverse the 16-month jail sentence, not because imposing it as a hammer was an abuse of discretion, but because imposing a jail term that exceeds 12 months as a condition of probation is an unauthorized sentence under Penal Code section 19.2. In the published portion of the opinion, we conclude the trial court erred in overruling Cowan's inability-to-pay objection. On the ability-to-pay issue, we hold that, upon proper objection, a sentencing court must allow a defendant facing imposition of a minimum restitution fine or court operations and court facilities assessments to present evidence and argument why these financial exactions exceed his ability to pay.

We ground our ability-to-pay holding on an excessive fines analysis under the Eighth Amendment and under article I, section 17 of the California Constitution, rather than the due process analysis *Dueñas* rests upon. While we ultimately reach a result similar to that in *Dueñas,* we order a disposition that is different in some respects from that ordered by the *Dueñas* panel. We shall direct that, upon remand, Cowan has the burden of proving inability to pay; that assessment of Cowan's ability to pay shall include not only present ability to pay but whether he has any reasonable prospect of paying in the future; and that, should the court find the restitution fine to be excessive, the appropriate disposition is to decline to impose it, not to stay it.

## I. BACKGROUND

On April 14, 2018, at about 6:10 p.m., San Francisco Police Sergeant James O'Malley was on patrol in the area of Polk and Grove Streets when he was approached by a woman, identified as "Arie," who said she believed two

2

white males were breaking into a car nearby.  Sergeant O'Malley went to the location of the reported break-in and found an empty parking space where glass shards were on the ground.  On the way, a second witness, identified as James Scott, said he saw one of the suspects, a man wearing a yellow jacket with dread-style hair, use what appeared to be a cell phone to break the left rear passenger window of a "newer" "white" car that looked "similar to a Nissan Ultima [*sic*]" and reach into it.  Scott then saw a second man, who was nearby, eventually get in the car with the first man, at which point they drove off together.  The second man had long hair.

After driving in the vicinity of Market Street and Civic Center looking for the stolen car, 39 minutes after leaving the scene of the break-in Sergeant O'Malley drove off to respond to a call from dispatch about a matter near Larch Way and Eddy Street.  While en route to that area, on westbound Eddy Street at the intersection of Gough Street, Sergeant O'Malley saw a white Ford Fusion waiting there with a missing or rolled down left rear passenger window and a bicycle lying across the back seat.  The driver of the Fusion had "kind of a dreadlocks style" hair, the passenger had long hair, and both were white.

Sergeant O'Malley then decided to do an investigative stop and made a U-turn.  At that point, the Fusion accelerated quickly, squealing its tires, but was forced to stop in the midst of a traffic jam.  Sergeant O'Malley and multiple other officers who had been called in for backup converged on the car in heavy traffic.  Neither man in the car was wearing a yellow jacket.  Cowan, the driver of the car, was placed in handcuffs at the scene, and then taken to a cold show where he was identified by Scott as one of the two suspects who drove off in the burgled car.

Cowan filed a motion to suppress, arguing lack of reasonable suspicion to detain him in the traffic stop on Eddy Street. The motion was denied. After pleading guilty to second degree auto burglary (Pen. Code, § 459), Cowan, pending preparation of the probation report and sentencing, agreed to a 16-month hammer (i.e., imposition of a 16-month term in county jail if he failed to appear for his sentencing hearing or to his probation department interview). He failed to appear at both sentencing and his probation interview. At a continued sentencing hearing, the court rejected Cowan's excuses for these failures to appear—he claimed he was late to court because he had trouble finding a place to stow his backpack, and that he left a voicemail with the probation department asking to reschedule—and then sentenced Cowan to three years' formal probation, subject to the 16-month hammer. The court also imposed a $300 restitution fine (Pen. Code, § 1202.4), a $40 court operations assessment (Pen. Code, § 1465.8), and a $30 court facilities assessment (Gov. Code, § 70373).

Appealing from the judgment of conviction and the sentence, Cowan argues that: (1) the court erroneously denied his pre-plea motion to suppress because his detention 39 minutes after and eight to ten blocks from the scene of the break-in based on nothing more than that he was a white man with dread-style hair, driving a white car, is not enough to justify a detention under *Terry v. Ohio* (1968) 392 U.S. 1 (*Terry*); (2) the court abused its discretion in imposing the 16-month hammer because there is no substantial evidence that Cowan's failures to show up to the sentencing hearing and to his probation department appointment were willful; and (3) we should either strike the restitution fine and the assessments or stay them under *Dueñas*. We reject the first argument, but find merit to the second and third.

4

## II. DENIAL OF MOTION TO SUPPRESS

We conclude that when Sergeant O'Malley encountered Cowan on Eddy Street, he had specific and articulable facts indicating Cowan's possible involvement in criminal activity.

Two witnesses told O'Malley that each believed two white men were breaking into a car. The second witness, Scott, described the men as having long hair, and said one of them had dreadlocks. Scott said the man with dreadlocks broke the left rear passenger window of the car by using a cell phone. Scott described the car as a newer white car, "similar to a Nissan Ultima [*sic*]." O'Malley was familiar with this car. He described it as a "medium-size sedan, four doors, kind of common and sedan styling, similar to a number of sedans on the market." Scott next led Sergeant O'Malley to the location where he had made his observations. There, O'Malley observed an empty parking space with shards of shattered glass on the ground. Approximately 40 minutes later, a distance away but in the same general area, Sergeant O'Malley saw a white male with dreadlocks driving a white four-door Ford Fusion. The Fusion was a newer model, a 2017, and the passenger in the car was a white male with long hair. Furthermore, the "left rear window was either down or missing."

Challenging the grounds for detention as violative of the Fourth Amendment under *Terry, supra,* 392 U.S. 1, Cowan emphasizes the different makes of the two cars involved, the distance between the location of the crime and the location where he was detained, the passage of time, and the differences between the two scenes (i.e., bicycle on back seat in one scene but not the other, yellow jacket in one scene but not the other). We are not persuaded that any of these "discrepancies" makes a difference for Fourth Amendment purposes. Enough unique identifiers were known to Sergeant

5

O'Malley—white, relatively new sedan in the same general area as the break-in; two white men in it, one with dread-style hair; open left rear passenger window—to detain the men in the car for questioning, especially since the driver's conduct could reasonably be interpreted as an attempt to flee in the presence of police.

This is not a case in which a detention was made based on a hunch, without any objective specifics connecting the detainee to criminal activity. Upon consideration of the totality of the circumstances, we are satisfied that, when Sergeant O'Malley spotted Cowan driving a white car on Eddy Street, he had ample basis to connect him to the car theft in the vicinity of Polk and Grove Streets and thus to conduct a *Terry* stop. (*In re Tony C.* (1978) 21 Cal.3d 888, 894 ["The possibility of an innocent explanation does not deprive the officer of the capacity to entertain a reasonable suspicion of criminal conduct. Indeed, the principal function of [police] investigation is to resolve that very ambiguity and establish whether the activity is in fact legal or illegal"]; *People v. Leath* (2013) 217 Cal.App.4th 344, 354–355 [minor discrepancies in descriptions of a suspect or a vehicle are not dispositive for purposes of reasonable suspicion].)

### III. IMPOSITION OF 16-MONTH HAMMER

At the sentencing hearing on January 9, 2019, the prosecutor pointed out that Cowan had been on felony probation at the time of the vehicle burglary to which he pleaded guilty, and that he had a very extensive criminal history. The prosecutor stated that the terms of the hammer were quite clear—that it would indeed serve as a hammer, not as a substitute sentence. The prosecutor stated he would compromise and agree to a one-year hammer for Cowan with probation still being in place. The prosecutor argued that the "credit for time served" sentence recommended by the

6

probation officer, "given the nature of the negotiations that occurred in this case" and given Cowan's history, was not appropriate. And, the prosecutor continued, "irrespective of what probation may indicate what they think is appropriate here, they were not part of the negotiated deal. That negotiated deal Mr. Cowan agreed to included the 16-month hammer. [¶] If he is uninterested in the proposed compromise of a year, then I think that the 16-month hammer should be imposed, and he should still be on probation afterwards."

The court essentially agreed with the prosecutor: "THE COURT: So in the Court's view, [the prosecutor]'s position is correct. The parties['] negotiated resolution here stated clearly on the record, and the Adult Probation Department's overall recommendation are the same. That is, if the defendant failed to comply with the conditions of the hammer, as he did, the recommendation I'm looking at in the pre-sentence report is that he be sentenced to a term of 16 months as well as be placed on probation. [¶] And the pre-sentence report very clearly states the reasons for that conclusion, stating that Mr. Cowan has an extensive criminal history dating back to 1999. He has been sentenced to probation on numerous occasions which were met with probation violations, modifications, and unsuccessful terminations. He also has been sentenced to state prison in another state on two occasions, and among other things, that at the time of his arrest he was on felony probation in San Francisco for second-degree burglary."

After reciting this background relating to Cowan's record of prior convictions and probation history, the court turned to the parties' discussions about Cowan's sentence. "[T]he Court has engaged in discussions—informal discussions with counsel in chambers, intended to arrive at a sentence that albeit one at variance with the one that the defendant expressly agreed to on

7

the record, that in the Court's and the parties' view would be a just sentence under the circumstances. [¶] And it was under those circumstances that [the prosecutor] is, as he has indicated, that the People, as a compromise, would be willing to reduce the so-called hammer to [a] 12-month period rather than a 16-month period. Of course what we are talking about here is the defendant is 4019 eligible. [¶] So, [defense counsel], you offered me a choice. I'm going to offer your client, in turn, a choice, and then I'm going to give you a couple of minutes to consider it with him, and then I'm going to impose sentence."

At that point the court set out Cowan's options. "The choices [are] as follows: I will either sentence him in accordance with the terms of the parties' original negotiated settlement; that is, that he be placed on three years of Adult Probation, on the condition that he serve 12 months in the—16 months in the county jail, and the other conditions that were agreed to at the time. [¶] Or if he is willing to accept the conditions of probation, I would be willing to impose sentence on the compromised version that [the prosecutor] has suggested; that is, that—the custody condition of probation be a 12-month period. If he is going to accept that sentence, that is the sentence I will impose. [¶] If he will not, I will impose the original negotiated 16-month probationary sentence. So I'm going to give you a couple of minutes to discuss that with your client. Those are his choices. And I will be back in 5 minutes or so, and we will decide which way to go."

After a short recess, on-the-record proceedings resumed and defense counsel told the court that Cowan did not want to accept the 12-month compromise, but wanted "the hammer of 16 months imposed with no probationary terms." The court told counsel and Cowan no—that was not one of the choices given to Cowan—and then imposed sentence, in relevant part,

8

as follows: "THE COURT: Very well. Consistent with the parties' negotiated resolution in this case, it is the judgment and sentence of the Court as follows: Imposition of sentence is suspended. Defendant is placed on formal probation to the Adult Probation Department for a period of 3 years on the following terms and conditions: [¶] He shall serve 16 months in the county jail. He is entitled to credit for time served of 81 days. He is subject to a search and seizure condition. His person, property, premises and vehicle are subject to search without probable cause or reasonable suspicion at any time of the day or night by any peace, parole or probation officer."

Cowan argues that the imposition of a 16-month jail term as a hammer for his failure to appear at sentencing on October 18, 2018, was an abuse of discretion. We need not reach that issue because the sentence must be vacated for another reason. Except in situations not here relevant, under Penal Code section 19.2 "[i]n no case shall any person sentenced to confinement in a county or city jail . . . , as a condition of probation upon conviction of either a felony or a misdemeanor . . . be committed for a period in excess of one year." The negotiated sentence of three years' probation subject to a custody condition of 16 months in jail exceeded the maximum period of confinement that may be imposed under Penal Code section 19.2; Cowan could have been sentenced to a 16-month jail term, or to probation for 3 years, but not to both unless the custody term was 12 months or less.[1] We

---

[1] We note the court in *People v. Bailey* (1983) 140 Cal.App.3d 828, 831 held the provision of Penal Code former section 19a (now Pen. Code, § 19.2) specifying the one-year limit on county jail time as a condition of probation may be waived by the defendant. Specifically, the *Bailey* court concluded that, because "section 19a was designed exclusively for the defendant's protection, we see no legal impediment to defendant's knowing and intelligent waiver of the one-year limitation therein on confinement in the

must therefore vacate the imposed jail term of 16 months as an unauthorized sentence and remand for resentencing.

## IV. ASSESSMENTS AND RESTITUTION FINE

Cowan argues that, under *Dueñas*, *supra*, 30 Cal.App.5th 1157, the trial court violated his federal and state rights to due process by imposing the $70 in assessments and the $300 restitution fine—both of which are statutory minimums for such assessments and fines—without determining his ability to pay. At sentencing, Cowan's counsel stated that Cowan "has no ability to pay. So most, if not all, of these fines and penalties should not be assessed because he has no ability to pay." The Attorney General acknowledges that an objection on *Dueñas* grounds was made, that as a result the forfeiture doctrine is not applicable, and that Cowan's attack on the restitution fine and

---

county jail." (*Bailey*, *supra*, at p. 831.) But the record here shows no such waiver. Although Cowan agreed to the 16-month hammer when he entered his guilty plea, the transcript of that hearing does not show that Cowan was advised he had a statutory right to receive no more than a 12-month county jail term as a condition of probation, or that he knowingly and intelligently waived that statutory right.

In the related context of a waiver of custody credits under Penal Code section 2900.5, our Supreme Court has stated: "The gravamen of whether such a waiver is knowing and intelligent is whether the defendant understood he was relinquishing or giving up custody credits to which he was otherwise entitled under section 2900.5." (*People v. Arnold* (2004) 33 Cal.4th 294, 308; see also *People v. Sivongxxay* (2017) 3 Cal.5th 151, 166 [criminal defendant's waiver of right to jury trial " ' "may not be accepted by the court unless it is knowing and intelligent, that is, " ' "made with a full awareness both of the nature of the right being abandoned and the consequences of the decision to abandon it" ' " ' " '].) There is no evidence here that Cowan understood he was relinquishing or giving up a statutory right (the 12-month limitation on county jail time that may be imposed as a condition of probation) to which he was otherwise entitled.

10

the assessments is cognizable on appeal.  We must therefore address the merits of this issue.

## A. *People v. Dueñas*

After little more than a year on the books, the facts and the issues at stake in *Dueñas* are by now well known, but they bear repeating as background before we proceed further.  The case involved a homeless probationer, Velia Dueñas, who suffered from cerebral palsy and was unable to work.  (*Dueñas*, *supra*, 30 Cal.App.5th at p. 1160.)  Ms. Dueñas's driver's license was suspended when she could not pay some juvenile citations she received as a teenager.  (*Id*. at p. 1161.)  She was then convicted of a series of misdemeanor offenses for driving with a suspended license, and in each case was given the impossible choice whether to "pay" mandatory fees and fines—which she could not do because of her poverty—or go to jail.  (*Ibid*.)  And after serving jail time in the first three of these cases, she still faced outstanding debt, which mounted with each conviction.  (*Ibid*.)

Upon her fourth conviction for driving with a suspended license, Ms. Dueñas was placed on probation and again ordered to pay mandatory assessments and fines.  (*Dueñas*, *supra*, 30 Cal.App.5th at pp. 1161–1162.)  In an effort to put a stop to these spiraling fees and fines, Ms. Dueñas objected, on due process and equal protection grounds, to a $40 Penal Code section 1465.8 court operations assessment, a $30 Government Code section 70373 court facilities assessment, and a $150 Penal Code section 1202.4 restitution fine.  (*Dueñas*, *supra*, at pp. 1163–1164.)  The core of her theory was that these statutes unconstitutionally "use the criminal law, which is centrally concerned with identifying and punishing only blameworthy decisions, to punish the blameless failure to pay by a person who cannot pay because of her poverty.  The laws, moreover, are irrational:  They raise no

11

money because people who cannot pay do not pay." (*Id.* at p. 1164.) As one sociological study put it, the laws' function is akin to "[d]rawing [b]lood from [s]tones."[2]

A Second District, Division Seven panel agreed. The panel held that Government Code section 70373 and Penal Code section 1465.8—which are silent on the issue of ability to pay—"if imposed without a determination that the defendant is able to pay, are . . . fundamentally unfair" and that "imposing these assessments upon indigent defendants without a determination that they have the present ability to pay violates due process" under the federal and state Constitutions. (*Dueñas*, *supra*, 30 Cal.App.5th at p. 1168.) Treating the restitution fine separately, the panel held that "although Penal Code section 1202.4 bars consideration of a defendant's ability to pay unless the judge is considering increasing the fee over the statutory minimum, the execution of any restitution fine imposed under this statute must be stayed unless and until the trial court holds an ability to pay hearing and concludes that the defendant has the present ability to pay [it]." (*Id.* at p. 1164.)

While the *Dueñas* panel takes care to announce its holding in due process terms,[3] the foundation for its two-part disposition—a reversal of the order imposing the assessments for failure to consider ability to pay, and a stay of execution of the restitution fine pending an ability-to-pay hearing—

---

[2] Harris et al., *Drawing Blood from Stones: Legal Debt and Social Inequality in the Contemporary United States* (2010) 115 Am. J. Soc. 1753.

[3] *Dueñas*, *supra*, 30 Cal.App.5th at page 1171 (focus of due process inquiry is whether "it is 'fundamentally unfair' to use the criminal justice system to impose punitive burdens on probationers who have 'made all reasonable efforts to pay the fine or restitution, and yet cannot do so through no fault of [their] own' "); *id.* at page 1167 ("[i]mposing unpayable fines on indigent defendants is . . . unfair").

ultimately rests on a synthesis of due process and equal protection principles. (See *Griffin v. Illinois* (1956) 351 U.S. 12, 17 (plur. opn. of Black, J.) (*Griffin*); *Bearden v. Georgia* (1983) 461 U.S. 660, 665–667 (*Bearden*); *In re Antazo* (1970) 3 Cal.3d 100, 107–109 (*Antazo*).)  This blend of due process and equal protection, described in *Dueñas* as "*Griffin-Antazo-Bearden* analysis" (*Dueñas*, *supra*, 30 Cal.App.5th at p. 1168), " 'call[s] for procedures in criminal trials which allow no invidious discriminations between persons and different groups of persons' " (*id.* at p. 1166) and bars a state from "inflict[ing] . . . punishment on indigent convicted criminal defendants solely on the basis of their poverty." (*Ibid.*)

Applying *Griffin-Antazo-Bearden* analysis to the assessments and the fine imposed on Ms. Dueñas, starting first with the assessments, the panel begins from the premise that neither the court operations assessment nor the court facilities assessment is "intended to be punitive in nature." (*Dueñas, supra,* 30 Cal.App.5th at p. 1165; see *People v. Alford* (2007) 42 Cal.4th 749, 757 (*Alford*) [Pen. Code, § 1465.8]; *People v. Fleury* (2010) 182 Cal.App.4th 1486, 1492–1494 [Gov. Code, § 70373].)  But by loading these two nominally non-punitive assessments on top of Ms. Dueñas's sentence, along with the "additional, potentially devastating" financial consequences to which they exposed her, the governing statutes, in effect, "transform a funding mechanism for the courts into additional punishment for a criminal conviction for those unable to pay." (*Dueñas*, *supra*, at p. 1168.)  This, the panel concludes, amounts to inflicting punishment solely because of an indigent's poverty.  (*Id.* at pp. 1166–1168.)

Central to the analysis in *Dueñas* is its reading of the statutory scheme of which Government Code section 70373 and Penal Code section 1465.8 were part.  The court points out that these statutes were part of court funding

13

legislation largely directed to the civil sphere. (*Dueñas*, *supra*, 30 Cal.App.5th at p. 1165.) While the Legislature authorized fee waivers as a "protective mechanism [to] lessen[ ] the disproportionate burden that these fundraising fees present to indigent litigants" (*id*. at p. 1166; see Gov. Code, § 68632, subds. (a)–(c)), it provided no such accommodation to criminal defendants. (*Dueñas*, *supra*, at p. 1166.) Relying on *Jameson v. Desta* (2019) 5 Cal.5th 594, the *Dueñas* panel concludes that since assessments imposed under these statutes are "part of a larger statutory scheme [designed] to raise revenue to fund court operations, [they] should be treated no differently than their civil counterparts enacted in the same legislation and imposed only on those with the means to pay them." (*Dueñas*, *supra*, at p. 1169.)

The focus of the analysis for the restitution fine in *Dueñas* is slightly different. There, the panel recognizes that restitution fines are punitive in nature and may be imposed as a condition of probation. (*Dueñas*, *supra*, 30 Cal.App.5th at p. 1169; see *People v. Hanson* (2000) 23 Cal.4th 355, 363 (*Hanson*); Pen. Code, § 1202.4, subd. (m).) So instead of barring imposition altogether, the panel stays execution until an ability-to-pay hearing is held. (*Dueñas*, *supra*, at pp. 1164, 1172.) In doing so, the panel focuses on disparities in treatment among defendants, comparing those who are able to pay to those who are not. (*Id.* at p. 1170.) Because of the express statutory prohibition on consideration of ability to pay at the time of imposition, and because, unlike probationers who are able to pay their fines, indigent probationers who are unable to pay will never be entitled to automatic expungement of their convictions for successful completion of probation, the panel concludes that "the criminal justice system punishes indigent defendants in a way that it does not punish wealthy defendants." (*Ibid*.) To avoid an interpretation of the statute that would result in a constitutional

14

violation, the *Dueñas* court ordered a stay pending an ability-to-pay hearing at which the People will bear the burden.  (*Id*. at pp. 1164, 1172.)

## B. The *Dueñas* Critics

We preface our analysis with a brief summary of a series of Court of Appeal opinions over the last year taking the view that there is "no general due process and equal protection authority which *requires* a court to conduct a *preassessment present ability-to-pay* hearing" for fines, fees or assessments. (*People v. Gutierrez* (2019) 35 Cal.App.5th 1027, 1039 (conc. opn. of Benke, Acting P. J.) (*Gutierrez*).)  These opinions, some issued by appellate panels (*People v. Hicks* (2019) 40 Cal.App.5th 320, 322, review granted Nov. 26, 2019, S258946 (*Hicks*); *People v. Aviles* (2019) 39 Cal.App.5th 1055, 1060–1061 (*Aviles*)), and others by individual justices writing separately,[4] either reject *Dueñas* outright or reject its reasoning while distinguishing it factually.[5]  They criticize *Dueñas* for misreading *Griffin*, which they contend applies only to financial barriers impeding access to courts (*Hicks*, *supra*, at pp. 325–326; *Aviles*, *supra*, at pp. 1065, fn. 23, 1068), and for similarly misreading the offspring of that opinion, *Antazo*, decided by our Supreme Court, and *Bearden*, decided by the United States Supreme Court, each of which they contend applies only to incarceration for failure to pay monetary

---

[4] *Gutierrez*, *supra*, 35 Cal.App.5th at page 1034 (conc. opn. of Benke, Acting P. J.); *People v. Kopp* (2019) 38 Cal.App.5th 47, 98 (conc. & dis. opn. of Benke, Acting P. J.), review granted Nov. 13, 2019, S257844 (*Kopp*); *People v. Santos* (2019) 38 Cal.App.5th 923, 936 (dis. opn. of Elia, J.) (*Santos*).

[5] *People v. Caceres* (2019) 39 Cal.App.5th 917, 926–929; see also *People v. Cota* (2020) 45 Cal.App.5th 786, 794–795 (*Cota*); *People v. Adams* (2020) 44 Cal.App.5th 828, 831; *People v. Lowery* (2020) 43 Cal.App.5th 1046, 1049, 1054–1055; *People v. Kingston* (2019) 41 Cal.App.5th 272, 279–281.

penalties. (*Hicks*, *supra*, at pp. 325–326; see *Aviles*, *supra*, at pp. 1065, fn. 23, 1069.)[6]

The majority opinion in *Kopp* is notable for its more nuanced critique of *Dueñas*. The *Kopp* majority organizes its analysis around a distinction between monetary charges imposed on convicted criminal defendants that are punitive in nature and those that are not. Directing its attention only to non-punitive assessments, *Kopp* agrees, "to some extent, with the court's conclusion in *Dueñas* that due process requires the trial court to conduct an ability-to-pay hearing and ascertain a defendant's ability to pay before it imposes court facilities and court operations assessments under Penal Code section 1465.8 and Government Code section 70373, if the defendant requests such a hearing." (*Kopp*, *supra*, 38 Cal.App.5th at p. 95.) Mindful that neither of the two appellants involved there had been allowed to make a record as to their financial condition, the court vacates and remands, but does so in a way that sets a higher bar for defendants seeking to establish inability to pay than *Dueñas* does. (*Id.* at pp. 95–96.) The *Kopp* court emphasizes that, on remand, the appellants must bear the burden of proving inability to pay and that the trial court could take into account not just present ability to pay at the time of sentencing, but future ability to pay such as capability to earn prison wages. (*Id.* at p. 96.)

Moving on from this cautious embrace of *Dueñas*'s treatment of non-punitive assessments, *Kopp* declines to follow the *Dueñas* panel's approach to punitive fines. (*Kopp*, *supra*, 38 Cal.App.5th at p. 96.) Consistent with the reasoning in *Aviles* and Justice Benke's concurrence in *Gutierrez*, *Kopp* holds

---

[6] See also *Gutierrez*, *supra*, 35 Cal.App.5th at pages 1038–1039 (conc. opn. of Benke, Acting P. J.); *Kopp*, *supra*, 38 Cal.App.5th at page 99 (conc. & dis. opn. of Benke, Acting P. J.); *Santos*, *supra*, 38 Cal.App.5th at pages 937–938 (dis. opn. of Elia, J.).

that punitive fines should be challenged under the excessive fines clauses of the federal and state Constitutions. (*Kopp, supra,* at pp. 96–97.) Within the framework of excessive fines protections, *Kopp* holds, punitive fines are governed by a four-factor test for excessiveness under the Eighth Amendment and under article I, section 17 of the state Constitution. (*Kopp, supra,* at p. 97.) Of these four factors—the defendant's culpability, the relationship between the harm and the penalty, the penalties imposed in similar statutes, and the defendant's ability to pay—*Kopp* points out that *Dueñas* focuses on only one, ability to pay. (*Id.* at pp. 97–98; see *id.* at p. 96.) The *Kopp* majority therefore orders that, on remand, appellants, if they wish, could challenge the fines imposed on them upon a consideration of all four relevant factors. (*Id.* at pp. 56–57, 97–98 & fn. 25.)[7]

The Attorney General's treatment of *Dueñas* in this case essentially adopts the stance of the *Kopp* majority, though he sees no need for a remand since in his view any *Dueñas* error was harmless. He "does not take issue with the *Dueñas* opinion insofar as it holds the imposition of assessments for court operations and court facilities may not be imposed where a defendant demonstrates the inability to pay." He also concedes that imposition of the assessments "implicates due process" and states that "respondent does not seek to uphold [them] . . . on those who have no ability to pay." Neither the $40 court operations assessment nor the $30 court facilities assessment is punitive in nature, he points out. "Both were enacted to fund the operations of the justice system. [Citations.] These [fees] by their own terms, are only

---

[7] The same court that decided *Dueñas*—Division Seven of the Second District—recently issued an opinion in *People v. Belloso* (2019) 42 Cal.App.5th 647, 649, 656–662, review granted March 11, 2020, S259755, adhering to its prior holding after considering and rejecting the various criticisms leveled in *Hicks* and *Aviles*.

imposed on those who seek access to the justice system and are convicted of a crime." But the Attorney General draws the line at "punishment in the form of fines," which he describes as "a cornerstone of our criminal justice system." Because restitution fines "advance[ ] the state's legitimate interests in punishing the guilty for their offenses," the Attorney General contends that "*Dueñas* was wrongly decided on that point and should not be followed."[8]

---

[8] We acknowledge, as did the *Dueñas* court (*Dueñas*, *supra*, 30 Cal.App.5th at p. 1164, fn. 1), that some significant legislative steps have been taken to mitigate the harshness of the mandatory imposition of criminal fees and fines. For example, "the Legislature [has] implemented several mechanisms over the last decade to help individuals reduce the impacts of their court-ordered debt." (Judicial Council of Cal., Rep. on the Statewide Collection of Delinquent Court-Ordered Debt for 2018–19, December 2019, p. 2.) Among the most notable are "authoriz[ation of] two amnesty programs, eliminat[ing] the provisions that required courts to place a hold or suspension on a driver's license for failure to pay traffic violations, increas[ing] the awareness and availability of community service in lieu of cash payments for fines, and encourag[ing] courts to develop procedures to determine an individual's ability to pay." (*Ibid*.)

Also, more recently, the Legislature passed Assembly Bill No. 927, a bill providing that, for any "fine, fee, or assessment related to a criminal or juvenile proceeding involving a misdemeanor or felony, prior to imposition, the court shall make a finding, based on a contested hearing or on stipulation of counsel, that the defendant or minor has the ability to pay." (Assem. Bill No. 927 (2019–2020 Reg. Sess.) § 1.) The Governor returned Assembly Bill No. 927 without signature, stating his support for it but expressing the view that, while "[w]e must tackle the issue of burdensome fines, fees and assessments that disproportionately drag low-income individuals deeper into debt and away from full participation in their communities[,] . . . I do not believe that requiring a hearing on defendants' ability to pay is the best approach in every case." (Governor's veto message to Assem. on Assem. Bill No. 927 (Oct. 9, 2019) Recess J. No. 14 (2019–2020 Reg. Sess.) p. 3651.)

## C. Analysis

"There is good reason to be concerned that fines, uniquely of all punishments, will be imposed in a measure out of accord with the penal goals of retribution and deterrence. . . . [Because] fines are a source of revenue . . . , it makes sense to scrutinize governmental action more closely when the State stands to benefit."[9]

While we do not join the courts that have declared *Dueñas* to have been wrongly decided, we do agree with an insight put forward in some of the opinions taking that position. A suitable framework for analyzing the constitutionality of the restitution fine imposed here, as well as the assessments, in our view, is the excessive fines prohibition in the Eighth Amendment and its counterpart under the California Constitution, article I, section 17. (E.g., *Gutierrez, supra*, 35 Cal.App.5th at p. 1040 (conc. opn. of Benke, Acting P. J.); *Kopp, supra*, 38 Cal.App.5th at p. 99 (conc. & dis. opn. of Benke, Acting P. J.).)[10] An excessive fines analysis "allows for a consistent and fair review of fines and fees imposed on individuals [while they are focused both legally and factually in the trial court], with the appeal process remaining available for further review." (*Kopp, supra*, at p. 100 (conc. & dis. opn. of Benke, Acting P. J.).)[11]

---

[9] *Harmelin v. Michigan* (1991) 501 U.S. 957, 978, footnote 9 (lead opn. of Scalia, J.).

[10] The Eighth Amendment to the United States Constitution states: "Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted." Article I, section 17 of the California Constitution states: "Cruel or unusual punishment may not be inflicted or excessive fines imposed."

[11] In his opening appellate brief, Cowan bases his challenge to the assessments and the restitution fine primarily on due process principles as outlined in *Dueñas*. But he also argues generally in his opening brief that, under *Dueñas*, the imposition of these monetary sanctions violates the excessive fines clause as well. Cowan states: "As discussed in *Dueñas*,

*1. The Restitution Fine and the Assessments All Qualify as "Fines" for Purposes of the Eighth Amendment and Article I, Section 17 of the California Constitution*

Underlying the Attorney General's position on Cowan's ability-to-pay objection is the implicit premise that the restitution fine is subject to scrutiny as an Eighth Amendment "fine," while the assessments are non-punitive and therefore do not fall within the ambit of federal or state constitutional prohibitions on excessive fines. We do not agree with that premise. Taking the analysis a step further than that of the *Kopp* majority or Justice Benke in her separate opinions in *Gutierrez* and *Kopp*, we believe that all of the monetary exactions at issue here must be treated as punitive in nature and thus may be analyzed as "fines" for purposes of the Eighth Amendment and article I, section 17 of the California Constitution. (*Aviles, supra*, 39 Cal.App.5th at p. 1071; *Cota, supra*, 45 Cal.App.5th at pp. 800–801 (conc. & dis. opn. of Dato, J.).)

" '[T]he method' courts use to determine 'what constitutes punishment varies depending upon the context in which the question arises.' " (*People v. Ruiz* (2018) 4 Cal.5th 1100, 1108, citing *People v. Castellanos* (1999)

imposition of the fines and fees challenged here, without a finding that the defendant has the present ability to pay, constitutes a violation of due process, equal protection *and the right to be free from excessive fines* under the United States and California Constitutions." (Italics added; citing *Timbs v. Indiana* (2019) ___ U.S. ___ [139 S.Ct. 682] (*Timbs*).) We conclude Cowan has adequately presented this issue on appeal. (See *Dueñas, supra,* 30 Cal.App.5th at p. 1171, fn. 8 [stating due process and excessive fines analyses are similar]; *Cota, supra*, 45 Cal.App.5th at p. 799 (conc. & dis. opn. of Dato, J.) ["the particular constitutional label [appellant] attaches to his [inability-to-pay] argument is unimportant"]; cf. *People v. Petri* (2020) 45 Cal.App.5th 82, 87 [declining to review restitution fine under excessive fines clause because defendant did not raise an Eighth Amendment challenge in his opening brief on appeal].)

20

21 Cal.4th 785, 795 (plur. opn. of George, C. J.) (*Castellanos*).) The conventional approach, which applies in double jeopardy and ex post facto cases, proceeds in two steps. (*United States v. Ward* (1980) 448 U.S. 242, 248–249 (*Ward*).) We look initially to "whether the Legislature intended the provision to constitute punishment" and we go no further if that intent is plain from the face of the statute or the legislative history. (*Castellanos, supra,* at p. 795 (plur. opn. of George, C. J.); see *Alford, supra*, 42 Cal.4th at p. 755.) If, on the other hand, " 'the intention was to enact a regulatory scheme that is civil and nonpunitive,' " we look further to " 'whether the statutory scheme is " 'so punitive either in purpose or effect as to negate [the State's] intention' to deem it 'civil' " ' " (*Alford, supra*, at p. 755) under the multifactor test in *Kennedy v. Mendoza-Martinez* (1963) 372 U.S. 144, 168– 169 (*Mendoza-Martinez*), which sets forth seven " 'useful guideposts.' " (*Castellanos, supra*, at p. 802 (conc. & dis. opn. of Kennard, J.).)[12] Under this approach, " 'we ordinarily defer to the legislature's stated intent' " (*Castellanos, supra*, at p. 795 (plur. opn. of George, C. J.)), and " ' "only the clearest proof" will suffice to override legislative intent and transform what has been denominated a civil remedy into a criminal penalty.' [Citations]." (*Id.* at p. 802 (conc. & dis. opn. of Kennard, J.).)

---

[12] "Whether the sanction involves an affirmative disability or restraint, whether it has historically been regarded as a punishment, whether it comes into play only on a finding of scienter, whether its operation will promote the traditional aims of punishment—retribution and deterrence, whether the behavior to which it applies is already a crime, whether an alternative purpose to which it may rationally be connected is assignable for it, and whether it appears excessive in relation to the alternative purpose assigned are all relevant to the inquiry[.]" (*Mendoza-Martinez, supra*, 372 U.S. at pp. 168–169, fns. omitted; see *Alford, supra,* 42 Cal.4th at p. 757.)

If we were to apply this two-step *Ward / Mendoza-Martinez* analytical paradigm, the Attorney General's bifurcated analysis of the restitution fine and the assessments might be warranted. Because the charge imposed under Penal Code section 1202.4 is denominated a "fine" and is levied only on convicted criminals, there would be no need to go beyond the face of the statute to justify the conclusion that the Legislature intended restitution fines to be punitive in nature.[13] By contrast for the assessments, the phrases "court operations assessment" and "court facilities assessment" signal an intent to raise revenue for the courts, and the legislative history confirms that objective.[14] Even granting that there may be some ambiguity because the assessments are imposed only on criminal convictions, we cannot say by " ' "the clearest proof" that "the [assessments are] so punitive either in purpose or effect as to negate [the Legislature's] intention" to deem [them] "civil." ' " (*Castellanos*, *supra*, 21 Cal.4th at p. 795 (plur. opn. of George, C. J.).)

But a different approach is called for in the context of excessive fines. The Eighth Amendment's "protection against excessive fines guards against abuses of government's punitive or criminal-law-enforcement authority," and applies to civil and criminal penalties alike. (*Timbs, supra,* ___ U.S. at p. ___ [139 S.Ct. at p. 686]; see *Austin v. United States* (1993) 509 U.S. 602, 610 (*Austin*).) Because monetary "sanctions frequently serve more than one

---

[13] *Hanson*, *supra*, 23 Cal.4th at page 361 (for double jeopardy purposes restitution fine imposed under Pen. Code, § 1202.4 is punitive).

[14] *Alford*, *supra*, 42 Cal.4th at pages 755–758 (for purposes of the prohibition on ex post facto laws court security fee imposed under Pen. Code, § 1465.8, subd. (a)(1) is not punitive); *People v. Knightbent* (2010) 186 Cal.App.4th 1105, 1111–1112 (same, relying on *Alford*; court facilities assessment imposed under Gov. Code, § 70373, subd. (a)(1)).

purpose" (*ibid.*) and have "multiple effects" (*People v. Ruiz*, *supra*, 4 Cal.5th at p. 1108), *Austin* announced a test for identifying an Eighth Amendment "fine" that is both simpler and broader than the more complex *Ward/Mendoza-Martinez* approach. Under *Austin*, because " '[t]he notion of punishment . . . cuts across the division between the civil and the criminal law,' " a monetary sanction that cannot " 'fairly be said *solely* to serve a remedial purpose' " will be subject to scrutiny as an Eighth Amendment fine if it "can only be explained as serving in part to punish." (*Austin*, *supra*, at p. 610, italics added; see *People ex rel. State Air Resources Bd. v. Wilmshurst* (1999) 68 Cal.App.4th 1332, 1350 (*Wilmshurst*) ["[e]ven assuming a fine serves *some* remedial purpose, it will be considered punishment [for purposes of applying the Eighth Amendment] if it *also* serves either retributive or deterrent purposes"].)

While we accept the Attorney General's view that the restitution fine imposed under Penal Code section 1202.4 is punitive in nature, we do not agree that the court facilities and court operations assessments are non-punitive. "Whether fees and assessments imposed on convicted defendants are sufficiently punitive to invoke the Eighth Amendment presents a closer question [than whether a restitution fine is], but we must keep in mind that the standard asks merely whether they are *partially* punitive." (*Cota*, *supra*, 45 Cal.App.5th at p. 800 (conc. & dis. opn. of Dato, J.).) Even though the Legislature's court-funding objectives in enacting Government Code section 70373 and Penal Code section 1465.8 unmistakably point to a non-punitive intent, we cannot say that assessments imposed under these statutes solely serve a civil, remedial purpose. The nature of the proceeding in which a sanction is rendered—criminal or civil—is a powerful indicator of the sanction's character. (*In re Alva* (2004) 33 Cal.4th 254, 272.) The

23

assessments at issue here are imposed "on every conviction for a criminal offense[.]"  (Pen. Code, § 1465.8; Gov. Code, § 70373.)  Because these assessments are "conditioned on the commission of a crime" (*Department of Revenue of Montana v. Kurth Ranch* (1994) 511 U.S. 767, 781), we think they can only be explained as serving, in part, to punish.  Accordingly, we conclude that, under *Austin*, the assessments, as well as the restitution fine, must be treated as "fines" for purposes of the excessive fines prohibitions in the federal and state Constitutions.

> 2. *Ability to Pay Is an Important Consideration in Evaluating Whether These "Fines" Are "Excessive" Under the Excessive Fines Prohibitions of the Eighth Amendment and Article I, Section 17 of the California Constitution*

In evaluating excessiveness, the starting point for analysis—though not the end of it—is *United States v. Bajakajian* (1998) 524 U.S. 321 (*Bajakajian*), where the United States Supreme Court announced an excessiveness test that has been recognized by California courts as applicable to both the federal and state excessive fines clauses.  There, the high court upheld a lower court's refusal to impose a $357,144 forfeiture for the federal offense of taking more than $10,000 in currency through customs without reporting it.  (*Id.* at p. 324.)  Concluding that the amount of the forfeiture sought by the government was grossly disproportionate to the gravity of the offense and the harm that it caused, the court found that the amount of the proposed forfeiture would violate the Eighth Amendment.  (*Bajakajian*, *supra*, at pp. 324, 337–340.)

What is most salient about *Bajakajian*, in our view, is something the Supreme Court did not address.  In a footnote, the court left open the question whether "wealth or income are relevant to the proportionality determination" or whether a deprivation of one's livelihood may bear on the Eighth Amendment excessiveness analysis.  (*Bajakajian*, *supra*, 524 U.S. at

24

p. 340, fn. 15.)  Federal circuit courts have divided on this question.  Some have held that ability to pay is relevant, either as part of a proportionality inquiry (e.g., *United States v. Viloski* (2d Cir. 2016) 814 F.3d 104, 111 (*Viloski*))[15] or in addition to it (*United States v. Levesque* (1st Cir. 2008) 546 F.3d 78, 83–85 (*Levesque*)).  And others have held ability to pay has no bearing on the *Bajakajian* analysis (e.g., *United States v. Dubose* (9th Cir. 1998) 146 F.3d 1141, 1145–1146),[16] with most arriving at that conclusion in the context of forfeiture orders, where the issue of ability to pay is often irrelevant in any event because the issue there generally is confiscation of identified assets rather than imposition of a monetary sanction.

How the high court will resolve the relevance of ability to pay in Eighth Amendment excessive fines analysis remains to be seen.  Although we find notable a passing observation in *Timbs* that the excessive fines clause traces its "venerable lineage" back to the Magna Carta, which safeguarded the " 'contenement' " of Englishmen and "required that economic sanctions . . . 'not be so large as to deprive [an offender] of his livelihood' " (*Timbs*, *supra*, ___ U.S. at p. ___ [139 S.Ct. at pp. 687–688]),[17] we need not take the

---

[15] See also *United States v. Lippert* (8th Cir. 1998) 148 F.3d 974, 978 (*Lippert*).

[16] See also *United States v. Smith* (8th Cir. 2011) 656 F.3d 821, 827–828; *United States v. Dicter* (11th Cir. 1999) 198 F.3d 1284, 1292, footnote 11; *United States v. 817 N.E. 29th Drive, Wilton Manors, Fla.* (11th Cir. 1999) 175 F.3d 1304, 1311.

[17] The court's reference to the "contenement" of Englishmen and the deprivation of livelihood is consistent with scholarly literature arguing that the original meaning of the Eighth Amendment's excessive fines clause prohibits fines so severe as to deprive a defendant of his or her "contenement" or livelihood, understood as the ability to secure the necessities of life.  (See McLean, *Livelihood, Ability to Pay, and the Original Meaning of the Excessive Fines Clause* (2013) 40 Hastings Const. L.Q. 833, 854–872.)  As explained by

discussion of this background point in *Timbs* as a prediction of what the high court's ultimate answer will be, for California courts have already held that ability to pay is relevant to excessiveness, and they have done so in applying both the Eighth Amendment and article I, section 17 of the California Constitution.  (*Lockyer v. R.J. Reynolds Tobacco Co.* (2005) 37 Cal.4th 707, 728 (*Lockyer*).)[18]

At issue in *Lockyer* was a fine of $14,826,200 imposed on a tobacco company, R.J. Reynolds, for giving out free cartons of cigarettes at various public gatherings in violation of a statute prohibiting the " 'nonsale distribution' " of cigarettes on public premises.  (*Lockyer, supra,* 37 Cal.4th at p. 712.)  R.J. Reynolds attacked the fine as violative of the excessive fines prohibitions in the federal and state Constitutions and argued that its statutory violations were in good faith.  (*Id.* at pp. 727–728.)  In analyzing whether good faith is relevant to the determination of whether a fine or penalty is constitutionally excessive, the court concluded that it was not necessary to undertake a separate due process analysis.  (*Id.* at p. 728.)  The court held that this defense was cognizable, and remanded for the trial court

---

one commentator (who is cited extensively by the court in its historical discussion of the excessive fines clause in *Browning-Ferris Industries v. Kelco Disposal, Inc.* (1989) 492 U.S. 257, 269), "the great object" of provisions of the Magna Carta limiting fines was that "[i]n no case could the offender be pushed absolutely to the wall:  his means of livelihood must be saved to him." (McKechnie, Magna Carta:  A Commentary on the Great Charter of King John (2d ed. 1914) p. 287; see also Massey, *The Excessive Fines Clause and Punitive Damages:  Some Lessons from History* (1987) 40 Vand. L.Rev. 1233, 1259–1260 & fn. 154.)

[18] See also *People v. Overstock.com, Inc.* (2017) 12 Cal.App.5th 1064, 1091; *City and County of San Francisco v. Sainez* (2000) 77 Cal.App.4th 1302, 1322 (*Sainez*); *Wilmshurst, supra,* 68 Cal.App.4th at page 1350.

"to determine whether defendant believed, in good faith, that its conduct conformed" to the statute it was charged with violating. (*Id*. at p. 731.)

The key here is not *Lockyer*'s precise holding on good faith, but its reading of the test for excessiveness. Observing that article I, section 17 of the California Constitution provides "similar protection[ ]" to the Eighth Amendment's excessive fines clause, the court centered its analysis on *Bajakajian, supra*, 524 U.S. 321. It began with the overarching premise in *Bajakajian* that " '[t]he touchstone of the constitutional inquiry under the Excessive Fines Clause is the principle of proportionality' " (*Lockyer, supra*, 37 Cal.4th at p. 728), and then went on to list the following four considerations bearing on proportionality: "(1) the defendant's culpability; (2) the relationship between the harm and the penalty; (3) the penalties imposed in similar statutes; and (4) the defendant's ability to pay." (*Ibid*.) Of these factors, only the first three were at issue in *Bajakajian*. For the fourth factor—ability to pay—the *Lockyer* court relied not only on *Bajakajian*, but also on the Court of Appeal decision in *Sainez, supra*, 77 Cal.App.4th at pages 1320–1322. (*Lockyer, supra*, at p. 728.) Notably, *Sainez* relied on *Lippert, supra*, 148 F.3d 974, one of the federal circuit cases taking the more expansive view that ability to pay is relevant to excessiveness under *Bajakajian*. (*Sainez, supra*, 77 Cal.App.4th at p. 1322.)[19]

It is apparent from *Lockyer* that California courts, borrowing from a line of federal circuit cases, have adopted a broad reading of *Bajakajian* in

---

[19] *Sainez* was not the first California appellate opinion to adopt the view that ability to pay is relevant to excessiveness under *Bajakajian*. *Wilmshurst*—which the *Sainez* court cited—adopted that view as well, and it too relied on federal circuit precedent in line with *Viloski* and *Lippert*. (See *Wilmshurst, supra*, 68 Cal.App.4th at p. 1350, citing *United States v. Hines* (8th Cir. 1996) 88 F.3d 661, 664 (*Hines*).)

which ability to pay must be taken into account as a factor bearing on proportionality. "The critical question is whether a defendant's ability to pay is appropriately considered in determining whether there are constitutional limitations on the amounts of fines and fees imposed. If it is, [Cowan] should be afforded a hearing at which he can attempt to make his case." (*Cota, supra*, 45 Cal.App.5th at p. 799 (conc. & dis. opn. of Dato, J.).) We think it is. Because ability to pay is an element of the excessive fines calculus under both the federal and state Constitutions, we conclude that a sentencing court may not impose court operations or facilities assessments or restitution fines without giving the defendant, on request, an opportunity to present evidence and argument why such monetary exactions exceed his ability to pay.

"Ordinarily a reviewing court, having examined the relevant considerations, can decide for itself whether a fine or penalty is unconstitutionally excessive" (*Lockyer, supra,* 37 Cal.4th at p. 731), but where a defendant's excessive fine objection raises factual questions, a remand is required so that the trial court can make the necessary findings as a predicate to the excessiveness determination and weigh the relevant factors in the first instance. (*Ibid.*) Here, it must be borne in mind that "[p]roportionality is likely to be the most important issue in a forfeiture case, since the claimant-defendant is able to pay by forfeiting the disputed asset." (*Hines, supra*, 88 F.3d at p. 664.) "In imposing a fine, on the other hand, ability to pay becomes a critical factor." (*Ibid.*)[20] Making an ability-to-pay

---

[20] *Wilmshurst*, *supra*, 68 Cal.App.4th 1332, applying this aspect of the reasoning in *Hines*, holds that ability to pay stands on its own as an excessiveness consideration, wholly outside of the proportionality framework of *Bajakajian*. (*Id*. at p. 1350 ["The defendants' concern with the relationship between the amount of the fines and nature of their offenses or the amounts of fines imposed in other cases is consequently irrelevant; it is their ability to

record in the trial court need not entail a contested evidentiary hearing in every case. It can often be done by simple offer of proof. But it must be done where an excessive fines objection is interposed.

### 3. Guidance on Remand

In remanding, we add three final observations for the trial court's guidance.

First, *Dueñas* speaks of "present ability to pay" (*Dueñas, supra,* 30 Cal.App.5th at p. 1164), but we agree with *Kopp* that the evaluation of ability to pay must include future ability to pay. (*Kopp*, *supra*, 38 Cal.App.5th at p. 96.) That is more consistent with the statutory scheme. (Pen. Code, § 1202.4, subd. (d) ["Consideration of a defendant's inability to pay" in setting the amount of the fine "may include his or her future earning capacity"].) It is also more consistent with prior law. (*People v. Kay* (1973) 36 Cal.App.3d 759, 763.) The appropriate inquiry—aptly summarized in *Kay* as whether a defendant is presently able to pay or has any reasonable prospect of paying—must take into account the totality of Cowan's financial obligations in court-imposed debt. (Cf. *People v. Castellanos* (2009) 175 Cal.App.4th 1524, 1532 [construing Pen. Code, § 1202.5; ability-to-pay

---

pay which is the constitutional lodestar"].) While this doctrinal nuance aligns with federal circuit-level authority on the point (see *Levesque*, *supra*, 546 F.3d at pp. 83–85), the treatment of ability to pay as an excessiveness consideration outside of *Bajakajian*'s proportionality framework appears to be inconsistent with *Lockyer*'s holding that ability to pay is but one among several other proportionality factors under *Bajakajian*. Without going as far as *Wilmshurst* or *Levesque* does on this fine (but important) point of doctrine, we do agree that in cases involving fines or fees the relative weight to be given ability to pay in the proportionality calculus is much more important than it is in a forfeiture case.

inquiry "includes . . . an evaluation of the totality of an accused's financial responsibilities"].)[21]

Second, although *Dueñas* can be read to suggest that the People must bear the burden of proving a defendant's ability to pay a challenged assessment or fine (*Dueñas, supra,* 30 Cal.App.5th at p. 1172), we agree with the courts that have since held a defendant bears the burden of proof on that issue. (*Santos, supra,* 38 Cal.App.5th at p. 934; *Kopp, supra,* 38 Cal.App.5th at p. 96; *People v. Castellano* (2019) 33 Cal.App.5th 485, 490 [same division that decided *Dueñas* holding that defendant must "in the first instance contest . . . his or her ability to pay the [charges] to be imposed and at a hearing present evidence of his or her inability to pay"].) Thus, on remand, upon proper objection, the court must hold a hearing at which defendant will have an opportunity to bear his burden of proof on the issue of ability to pay.

Third, and finally, our analysis of the restitution fine as an excessive fines matter leads us to a different disposition than the *Dueñas* court reached

---

[21] While the totality of a defendant's financial responsibility in the ability-to-pay inquiry on a restitution fine includes any direct victim restitution that is ordered, we do not address whether direct victim restitution orders themselves constitute "fines" for purposes of the Eighth Amendment or article I, section 17 of the California Constitution. "Payment of direct victim restitution"—which is constitutionally mandated by article I, section 28, subdivision (b) of the California Constitution—"goes directly to victims and compensates them for economic losses they have suffered because of the defendant's crime. [Citations.] Restitution fines are payable to the state's 'Restitution Fund.' [Citation.] 'The purposes of the two kinds of restitution are different. The imposition of a restitution fine is punishment. [Citation.] The purpose of direct victim restitution, however, is to reimburse the victim for economic losses caused by the defendant's criminal conduct, i.e., to make the victim reasonably whole. [Citations.] Secondary goals of direct restitution include rehabilitation of the defendant and deterrence of future criminality.' [Citation.]" (*People v. Allen* (2019) 41 Cal.App.5th 312, 321.)

with respect to mandatory minimum fines imposed under Penal Code section 1202.4, subdivision (b)(1).  Under the holding in *Dueñas* these mandatory minimum fines must continue to be imposed, subject to a stay of execution where inability to pay is shown.  (*Dueñas, supra,* 30 Cal.App.5th at p. 1172.)  But because the right to be free from excessive fines under the federal and state Constitutions prohibits *imposition* of excessive fines, it would not be an appropriate remedy in this case should an excessive fines determination be made to allow imposition of a restitution fine subject to a stay.  If, upon remand, an excessive fines objection is made and upheld, the ruling will amount to a determination that the clause in Penal Code section 1202.4, subdivision (c) barring consideration of ability to pay—"[a] defendant's inability to pay shall not be considered a compelling and extraordinary reason not to impose a restitution fine"—is unconstitutional as applied, thus prohibiting imposition of the fine altogether.

## V.  DISPOSITION

The sentence to a 16-month term of incarceration is reversed.  The cause is remanded for further sentencing proceedings consistent with this opinion.  In all other respects, the judgment is affirmed.

STREETER, J.

WE CONCUR:

POLLAK, P. J.
TUCHER, J.

31

STREETER, J., Concurring.

While I concur in the lead opinion, I write separately to explain my preference for an additional rationale and to make clear that I do not subscribe to the view that *People v. Dueñas* (2019) 30 Cal.App.5th 1157 (*Dueñas*) was wrongly decided. If there is a shortcoming in *Dueñas*'s reasoning, in my view, it is that the panel there chose to frame its analysis exclusively in due process terms, without delving into other sources of constitutional protection, and without considering the degree to which state and federal law may diverge in these other areas. (*Dueñas*, *supra*, at pp. 1168, fn. 4, 1171, fn. 8.)

A recent concurrence and dissent by Justice Dato in *People v. Cota* (2020) 45 Cal.App.5th 786 (*Cota*) prefigures the approach we take in this case and raises some perceptive questions about the opinions that have rejected *Dueñas*. I share the concerns he expresses and will try to pick up where he left off, tackling some of the "doctrinal nuances" (*id.* at p. 801) I think make a difference here. While I agree that fines and fees imposed in criminal cases may be analyzed as an excessive fines matter, as do a number of leading scholars who have written in the area,[1] I do not agree that simply because an excessive fines analysis is fitting, it must be applied in lieu of other sources of constitutional protection—such as the right to equal protection or to due process—as if we were bound to follow something akin to the statutory

---

[1] See Colgan, *The Excessive Fines Clause: Challenging the Modern Debtors' Prison* (2018) 65 UCLA L.Rev. 2, 97–98 (*Challenging the Modern Debtors' Prison*); McLean, *Livelihood, Ability to Pay, and the Original Meaning of the Excessive Fines Clause* (2013) 40 Hastings Const. L.Q. 833, 901.

1

interpretation canon favoring the specific over the general.  I know of no such rule in constitutional adjudication.[2]

Below, I analyze the additional sources of constitutional protection that I think are implicated here, parsing them one by one.  First, I address the assessments as a matter of equal protection and due process under federal law.  I then turn to an analysis of the restitution fine together with the assessments, applying principles of equal protection under the California Constitution.  Ultimately, although I agree that in dealing with the monetary exactions before us the excessive fines clause of the Eighth Amendment and its state law counterpart, article I, section 17 of the California Constitution, provide a suitable framework for constitutional analysis, it is my view that

---

[2] The Attorney General suggests one with respect to the restitution fine.  On that issue, he contends the Eighth Amendment is exclusively applicable, citing *Graham v. Connor* (1989) 490 U.S. 386, to support the idea.  I am not persuaded that *Graham* has any relevance here.  That case arose under title 42 United States Code section 1983 (section 1983) and involved a damages claim for use of excessive force by a police officer during an arrest in violation of the Fourth Amendment.  At issue was the liability-creating standard governing excessive force claims in that context.  Because section 1983 is not itself the source of substantive rights, the high court concluded that "[t]he validity of [a section 1983] claim must . . . be judged by reference to the specific constitutional standard which governs that right, rather than to some generalized 'excessive force' standard." (*Graham*, *supra*, at p. 394; see also *Albright v. Oliver* (1994) 510 U.S. 266, 273 (plur. opn. of Rehnquist, C. J.) [" 'generalized notion of "substantive due process" ' "].)  As later explained in *United States v. Lanier* (1997) 520 U.S. 259, "*Graham* simply requires that if a constitutional claim"—read in context, a claim for damages—"is covered by a specific constitutional provision, such as the Fourth or Eighth Amendment, the claim must be analyzed under the standard appropriate to that specific provision, not under the rubric of substantive due process." (*Id*. at p. 272, fn. 7.)  Suffice it to say this is not a section 1983 case and we are not here called upon to invoke substantive due process as the basis for a damages claim.

the California equal protection guarantee is more suitable. In fact, I think there are good reasons to base the holding here solely on state equal protection grounds, and I would do so.

## I. FEDERAL LAW

### A. Equal Protection

Government Code section 70373 and Penal Code section 1465.8 create, in effect, " 'user' fee[s]" levied only on those in the criminal justice system who suffer convictions. (*People v. Rivera* (1998) 65 Cal.App.4th 705, 711.) Because these fees are mandatory—allowing no opportunity for an indigent defendant facing them to demonstrate that delinquency and its consequences are unavoidable—I believe their imposition without consideration of ability to pay violates the precept that "[t]here can be no equal justice" where the kind of justice "a man gets depends on the amount of money he has." (*Griffin v. Illinois* (1956) 351 U.S. 12, 19 (plur. opn. of Black, J.) (*Griffin*).) The *Hicks* court describes this principle as nothing more than a "sentiment." (*People v. Hicks* (2019) 40 Cal.App.5th 320, 328, review granted Nov. 26, 2019, No. S258946 (*Hicks*).) I think it deserves more respect than that. Some might say Justice Powell's opinion in *Regents of University of California v. Bakke* (1978) 438 U.S. 265 is the most influential modern equal protection decision announced by plurality. I would say it is Justice Black's opinion in *Griffin*.

Although the *Dueñas* opinion opens by invoking the broad principle of *Griffin*, it immediately turns to a due process analysis, relying heavily on *Bearden v. Georgia* (1983) 461 U.S. 660 (*Bearden*) and concluding that the assessments imposed under Government Code section 70373 and Penal Code section 1465.8 amount to "additional punishment." (*Dueñas*, *supra*, 30 Cal.App.5th at p. 1168; see *id.* at pp. 1166–1169.) I agree that an analysis

3

treating the assessments as punitive accords with Eighth Amendment precedent—and produces essentially the same result, guaranteeing a right to be heard on the issue of ability to pay, while barring rote imposition in every case—but I would prefer to see us stay true to *Griffin* within its conventional frame as an equal protection case, which is how our Supreme Court reads it. (See *People v. Reese* (2017) 2 Cal.5th 660, 664–668.)

The federal equal protection analysis here turns on two United States Supreme Court cases, *James v. Strange* (1972) 407 U.S. 128 (*James*), and *Fuller v. Oregon* (1974) 417 U.S. 40 (*Fuller*). *James* and *Fuller*, like *Bearden*, descend from *Griffin*, but within a different branch of *Griffin*'s progeny. Both involve so-called recoupment statutes under which criminal defendants for whom counsel is appointed may be ordered to reimburse the cost of their appointed counsel, with the reimbursement order then being enforceable as a civil judgment.

*James* arose under a recoupment statute in Kansas. The appellee there, David Strange, was arrested and charged with a felony, appeared before a magistrate, professed indigency, accepted appointed counsel, ultimately pled guilty to a reduced charge, and was placed on probation. (*James*, *supra*, 407 U.S. at p. 129.) The Kansas Judicial Administrator then requested reimbursement under the recoupment statute in the amount of $500 within 60 days, subject to entry of a civil judgment in that amount upon failure to pay. (*Ibid*.) Strange attacked the statute as facially unconstitutional, and a three-judge federal district court upheld the challenge, finding it constituted an impermissible burden on the right to counsel under *Gideon v. Wainwright* (1963) 372 U.S. 335 (*Gideon*). (*James*, *supra*, at pp. 128–129.) The United States Supreme Court affirmed, but chose to rule on equal protection grounds instead, citing *Rinaldi v. Yeager*

4

(1966) 384 U.S. 305 (*Rinaldi*) (*James*, *supra*, at p. 140), which struck down a statute authorizing recoupment from incarcerated indigent defendants of the costs of appellate transcripts. (*Id.* at pp. 134–140.)

*Rinaldi* is part of an extensive body of high court precedent applying the equal justice principle of *Griffin*. The focus of attack in *James* was a feature of the Kansas statute denying defendants facing recoupment the benefit of an "array of protective exemptions Kansas has erected for other civil judgment debtors, including restrictions on the amount of disposable earnings subject to garnishment, protection of the debtor from wage garnishment at times of severe personal or family sickness, and exemption from attachment and execution on a debtor's personal clothing, books, and tools of trade." (*James*, *supra*, 407 U.S. at p. 135.) The Supreme Court's opinion is not about ensuring meaningful access to a hearing on the merits—which is what the three-judge district court focused upon, relying on *Gideon* (*James*, *supra*, at p. 134; *Strange v. James* (D.Kan. 1971) 323 F.Supp. 1230, 1233–1234)—but unequal treatment of indigent criminal defendants compared to other civil judgment debtors. (*James*, *supra*, at pp. 135–136.)

Noting that the challenged statute applied to both convicted defendants and acquitted defendants, the high court saw no rational basis for treating either differently from other civil debtors. "The indigent defendant who is found guilty is uniquely disadvantaged in terms of the practical operation of the statute," the Supreme Court found. (*James*, *supra*, 407 U.S. at p. 139.) "A criminal conviction usually limits employment opportunities. This is especially true where a prison sentence has been served. It is in the interest of society and the State that such a defendant, upon satisfaction of the criminal penalties imposed, be afforded a reasonable opportunity of employment, rehabilitation and return to useful citizenship. There is limited

5

incentive to seek legitimate employment when, after serving a sentence during which interest has accumulated on the indebtedness for legal services, the indigent knows that his wages will be garnished without the benefit of any of the customary exemptions." (*Ibid*.)

The Supreme Court acknowledged the interests Kansas had in defraying the burgeoning costs of funding publicly appointed counsel in an era of expanding criminal dockets. "Such trends have heightened the burden on public revenues, and recoupment laws reflect legislative efforts to recover some of the added costs," the court observed. (*James*, *supra*, 407 U.S. at p. 141.) But despite the legitimacy of these interests, the court held that they "are not thwarted by requiring more even treatment of indigent criminal defendants with other classes of debtors . . . . State recoupment laws . . . need not blight in such discriminatory fashion the hopes of indigents for self-sufficiency and self-respect. The statute before us embodies elements of punitiveness and discrimination which violate the rights of citizens to equal treatment under the law." (*Id*. at pp. 141–142.)

*James* must be read together with *Fuller*, another recoupment case decided two terms later. *Fuller* involved the state of Oregon's recoupment statute. The question in *Fuller* was "whether Oregon may constitutionally require a person convicted of a criminal offense to repay to the State the costs of providing him with effective representation of counsel, when he is indigent at the time of the criminal proceedings but subsequently acquires the means to bear the costs of his legal defense." (*Fuller*, *supra*, 417 U.S. at p. 41.) Like the appellee in *James*, Prince Eric Fuller, an indigent, was charged with a felony, accepted publicly appointed counsel, entered a plea, and was placed on probation. (*Id*. at pp. 41–42.) Under the Oregon recoupment statute, as in Kansas, failure to pay reimbursement resulted in entry of a civil judgment,

6

subjecting criminal defendants to civil collection along with other civil judgment debtors.  (*Id.* at p. 47.)  The Oregon Court of Appeals distinguished *James*, rejecting a challenge to the sentencing court's authority to require reimbursement as a condition of probation.  (*State v. Fuller* (Or.Ct.App. 1973) 504 P.2d 1393, 1395.)

The high court affirmed, citing key differences between the Oregon statute and the Kansas statute.  First, "[t]he convicted person from whom recoupment is sought . . . retains all the exemptions accorded other judgment debtors[.]" (*Fuller*, *supra*, 417 U.S. at p. 47.)  Second, "the requirement of repayment 'is never mandatory.' " (*Id.* at p. 44.)  Third, defendants facing recoupment had the ability to argue against recoupment on the ground of " 'manifest hardship' " to them or their immediate families.  (*Id.* at pp. 45–46.)  Thus, the Supreme Court explained, "revocation of probation is not a collection device used by the State to enforce debts to it, but is a sanction imposed for 'an intentional refusal to obey the order of the court[.]' " (*Id.* at p. 48, fn. 9.)  And "[s]ince an order to repay can be entered only when a convicted person is financially able but unwilling to reimburse the State, the constitutional invalidity found in *James v. Strange* simply does not exist." (*Ibid.*)

Insofar as Cowan attacks the constitutionality of the court operations and court facilities assessments, *James* controls this case.  By their plain terms and their legislative history, neither of the statutes under which these assessments were imposed is intended to be punitive in nature, and outside of the Eighth Amendment context they must be treated as non-punitive. "Both were enacted as parts of more comprehensive legislation intended to raise funds for California courts.  Penal Code section 1465.8 was enacted in 2003 as part of a law that increased a number of court-related fees, including

7

small claims court filing fees, civil litigation filing fees, civil motions fees, and appellate filing fees; it also imposed new court fees, such as a fee for complex litigation, probate filing fees, and a fee for certain court reporter services. (Assem. Republican Bill Analysis of Assem. Bill No. 1759 (2003–2004 Reg. Sess.).)" (*Dueñas*, *supra*, 30 Cal.App.5th at p. 1165.)

"As its name suggests, equal protection of the laws assures that people who are ' "similarly situated for purposes of [a] law" ' are generally treated similarly by the law. [Citation.] Thus, ' "[t]he first prerequisite to a meritorious claim under the equal protection clause is a showing that the state has adopted a classification that affects two or more similarly situated groups in an unequal manner." ' " (*Vergara v. State of California* (2016) 246 Cal.App.4th 619, 644 (*Vergara*).) Under the user fee scheme the *Dueñas* court outlines, which broadly applies to civil and criminal litigants, all litigants subject to these fees are similarly situated. But while the Legislature "has recognized the deleterious impact of increased court fees on indigent people" (*Dueñas*, *supra*, 30 Cal.App.5th at p. 1165; see Gov. Code, § 68630, subd. (a)), it has accommodated only indigent *civil* litigants with fee waivers (Gov. Code, § 68631).

By singling out criminal defendants from among all litigants who are required to pay fees devoted to court funding and subjecting them, and them alone, to harsher treatment, the California Legislature has created a classification comparable to the one at issue in *James*. The same thing that was said there may be said here. Despite the state's considerable interest in defraying court operations and court facilities costs, "[w]e see no need . . . [to] blight in such discriminatory fashion the hopes of indigents for self-sufficiency and self-respect." (*James*, *supra*, 407 U.S. at pp. 141–142.) It is of course true that holding only convicted persons automatically to account

8

regardless of circumstances may be justified by their criminality, but that is not the stated intent of the legislation. And even if in reality it was the actual justification, that just shows "[t]he statute[s] before us embod[y] elements of punitiveness and discrimination which violate the rights of citizens to equal treatment under the law." (*Id*. at p. 142.)

*Fuller* draws a line that circumscribes revenue-raising in the form of user fees imposed singularly on convicted criminal defendants. What saved the cost recoupment statute there was (1) it was not mandatory; (2) it accommodated for inability to pay; and (3) by recognizing the same exemptions to civil collection against criminal debtors that civil debtors enjoyed, it treated all debtors, both criminal and civil, equally. (*Fuller*, *supra*, 417 U.S. at pp. 44–47.) None of that is true here. The "potentially devastating consequences" inflicted by mandatory assessments on indigent defendants "in effect transform a funding mechanism for the courts into additional punishment for a criminal conviction for those unable to pay." (*Dueñas*, *supra*, 30 Cal.App.5th at p. 1168.)

In *People v. Amor* (1974) 12 Cal.3d 20 (*Amor*), our Supreme Court rejected a federal equal protection challenge to the California recoupment statute, Penal Code section 987.8. It did so in reliance on *Fuller* (*Amor*, *supra*, at p. 27), pointing out that recoupment is imposed only on those determined to have the ability to pay (*id*. at p. 31). *James* cannot be distinguished on that ground or any other ground found sufficient to save Penal Code section 987.8 in *Amor*. I would therefore join the *Dueñas* panel in concluding that the court facilities and court security assessments "should be treated no differently than their civil counterparts enacted in the same legislation and imposed only on those with the means to pay them." (*Dueñas*,

*supra*, 30 Cal.App.5th at pp. 1168–1169.)  But under federal law, I would do so explicitly on equal protection as well as due process grounds.

## B. Due Process

The key to the federal due process analysis—and, of course, the centerpiece of the opinion in *Dueñas*—is *Bearden, supra,* 461 U.S. 660, a case that requires a close reading because of its unique place in the evolution of *Griffin*'s equal justice principle.  *Bearden* involved a probation revocation for failure to pay a fine and restitution.  After observing that "[t]his Court has long been sensitive to the treatment of indigents in our criminal justice system" (*Id.* at p. 664), the *Bearden* court framed the issue to be decided there as a matter of fairness, describing the question as "whether a sentencing court can revoke a defendant's probation for failure to pay the imposed fine and restitution, absent evidence and findings that the defendant was somehow responsible for the failure or that alternative forms of punishment were inadequate." (*Id.* at p. 665.)  While acknowledging that a defendant who willfully fails to pay a fine may be jailed, the high court held that automatic revocation of probation—without inquiry into a defendant's ability to pay, or exploring alternatives short of incarceration for those unable to pay—cannot survive constitutional scrutiny.  (*Id.* at pp. 670–672.)

*Bearden* cited *Griffin* as the genesis of the equal justice principle it applied (*Bearden*, *supra*, 461 U.S. at pp. 664–665), which makes sense, because for many years equal protection was the accepted mode of analysis in cases following from *Griffin*, consistent with *James.*  (See, e.g., *Williams v. Illinois* (1970) 399 U.S. 235, 241–242 (*Williams*); *Tate v. Short* (1971) 401 U.S. 395; *Rinaldi, supra,* 384 U.S. at pp. 307–308, 310–311; *Douglas v.*

10

*California* (1963) 372 U.S. 353, 355–357 (*Douglas*).)[3]  Indeed, the most direct

precursor to *Bearden*, the California Supreme Court's decision in *In re Antazo*

(1970) 3 Cal.3d 100, held that jailing a defendant for inability to pay a fine

violated equal protection (*id.* at pp. 103–104) based on a long line of cases

that "consistently reaffirmed [*Griffin*'s] fundamental principle of equal

justice" (*id.* at p. 110).  *Bearden* introduced a new approach, opting to place

its holding within an interest balancing framework that "emphasizes fairness

between the State and the individual dealing with the State."  (*Ross v. Moffitt*

(1974) 417 U.S. 600, 609; see *Bearden, supra*, at p. 665.)

Drawing largely from a reading of *Griffin* proposed in a series of

separate opinions authored by Justice Harlan[4] and adopted in *Boddie v.*

---

[3] See *Williams, supra*, 399 U.S. at page 244 ("We hold that the Equal
Protection Clause of the Fourteenth Amendment requires that the statutory
ceiling placed on imprisonment for any substantive offense be the same for all
defendants irrespective of their economic status"); *Tate v. Short, supra*,
401 U.S. at pages 397–398 ("We held [in *Williams*] that the Illinois statute as
applied to [the defendant there] worked an invidious discrimination solely
because he was too poor to pay the fine, and therefore violated the Equal
Protection Clause.  [¶] Although the instant case involves offenses punishable
by fines only, petitioner's imprisonment for nonpayment constitutes precisely
the same unconstitutional discrimination"); *Rinaldi, supra*, 384 U.S at
page 311 ("We may assume that a State can validly provide for recoupment of
the cost of appeals from those who later become financially able to pay.  But
any such provision must, under the Equal Protection Clause, be applied with
an even hand"); *Douglas, supra*, 372 U.S. at page 355 ("We agree . . . with
Justice Traynor of the California Supreme Court who said that the 'denial of
counsel for appeal [to an indigent] would seem to be a discrimination at least
as significant as that condemned in [*Griffin*]' ").

[4] *Douglas, supra,* 372 U.S. at page 363 (dis. opn. of Harlan, J.) ("The
real question in this case, I submit, and the only one that permits of
satisfactory analysis, is whether or not [a] state rule [denying appointment of
appellate counsel for indigents], as applied in this case, is consistent with the
requirements of fair procedure guaranteed by the Due Process Clause"); see

11

*Connecticut* (1971) 401 U.S. 371, 382, the *Bearden* court explained, "[a] due process approach has the advantage in this context of directly confronting the intertwined question of the role that a defendant's financial background can play in determining an appropriate sentence. When the court is initially considering what sentence to impose, a defendant's level of financial resources is a point on a spectrum rather than a classification. Since indigency in this context is a relative term rather than a classification, fitting 'the problem of this case into an equal protection framework is a task too Procrustean to be rationally accomplished[.]' [Citation.] The more appropriate question is whether consideration of a defendant's financial background in setting or resetting a sentence is so arbitrary or unfair as to be a denial of due process." (*Bearden, supra*, 461 U.S. at p. 666, fn. 8.) This is fundamentally a procedural due process test—an analytical approach which characteristically features interest balancing—as confirmed by the fact that, in support of it, the court cited leading procedural due process cases.[5]

Doctrinally, to be sure, the *Bearden* analysis has elements of both equal protection and due process. To resolve the question presented there as a matter of equal protection, the *Bearden* court explained, "one must determine whether, and under what circumstances, a defendant's indigent status may be considered in the decision to revoke probation." (*Bearden, supra*, 461 U.S. at p. 666.) But because that amounts to the same thing as "asking directly the due process question of whether and when it is fundamentally unfair or arbitrary for the State to revoke probation when an indigent is unable to pay

also *Griffin, supra*, 351 U.S. at pages 29–39 (dis. opn. of Harlan, J.); *Williams, supra*, 399 U.S. at pages 259–266 (conc. opn. of Harlan, J.).

[5] *Bearden, supra*, 461 U.S. at page 666, footnote 7 (citing *Morrissey v. Brewer* (1972) 408 U.S. 471; *Gagnon v. Scarpelli* (1973) 411 U.S. 778).

[a] fine" (*ibid*.), the court announced a multifactor balancing test in which "[d]ue process and equal protection principles converge." (*Id*. at p. 665.)[6] Instead of utilizing a traditional equal protection approach focused on invidious discrimination against a suspect class or the traditional substantive due process approach of identifying a burden on a fundamental right, the court announced a new, hybrid test in the following terms: "the issue cannot be resolved by resort to easy slogans or pigeonhole analysis, but rather requires a careful inquiry into such factors as 'the nature of the individual interest affected, the extent to which it is affected, the rationality of the connection between legislative means and purpose, [and] the existence of alternative means for effectuating that purpose.'" (*Bearden, supra*, at pp. 666–667, quoting *Williams, supra*, 399 U.S. at p. 260 (conc. opn. of Harlan, J.).)[7] Because it requires an ends-means inquiry and consideration of

---

[6] Cf. *Smith v. Robbins* (2000) 528 U.S. 259, 276 (" ' "[t]he precise rationale for the *Griffin* and *Douglas* lines of cases has never been explicitly stated, some support being derived from the Equal Protection Clause of the Fourteenth Amendment and some from the Due Process Clause of that Amendment." ' [Citation.] But our case law reveals that, as a practical matter, the two clauses largely converge to require that a State's procedure 'affor[d] adequate and effective appellate review to indigent defendants' ").

[7] Justice Marshall, who joined the *Bearden* opinion, long advocated a similar kind of interest balancing approach in equal protection cases as a clarifying alternative to what he viewed as the high court's "rigidified" tiers of scrutiny in traditional equal protection analysis. (*San Antonio Indep. Sch. Dist. v. Rodriguez* (1973) 411 U.S. 1, 98–99 (dis. opn. of Marshall, J.) (*Rodriguez*) ["A principled reading of what this Court has done reveals that it has applied a spectrum of standards in reviewing discrimination allegedly violative of the Equal Protection Clause. This spectrum clearly comprehends variations in the degree of care with which the Court will scrutinize particular classifications, depending, I believe, on the constitutional and societal importance of the interest adversely affected and the recognized invidiousness of the basis upon which the particular classification is drawn"];

13

alternatives, the *Bearden* test calls for a form of heightened scrutiny—more rigorous than rational basis, but less rigorous than strict scrutiny. Nothing in the high court's enunciation of the test suggests a limitation to deprivations of physical freedom or impediments on access to court.

To the extent this balancing test "wove together two distinct strands" of precedent spawned by *Griffin* (*Hicks*, *supra*, 40 Cal.App.5th at p. 325), the weaving was done in *Bearden*, not *Dueñas*. Applying it here, there can be no real debate about the ends-means inquiry and the availability of means more precisely fitted to the legislative objective of funding the courts. It is irrational to impose a funding burden on litigants who are unable to pay, for collection from them, by definition, is futile. The same legislative objective can be achieved in a less costly way, since the cost of futile collection efforts would be saved by screening out those who have no ability to pay. Certainly, for those most needy, the first two *Bearden* factors weigh heavily; the "nature" of the "individual interest affected" may include the potential loss of shelter, transportation, food and clothing, and its "extent" (*Bearden*, *supra*, 461 U.S. at pp. 666–667) can be a lifetime of "cascading consequences" (*Dueñas*, *supra*, 30 Cal.App.5th at p. 1163). Given the poor fit between means and objectives, the determinative factor in the interest balancing analysis is whether what the *Dueñas* court called the "potentially devastating consequences" of imposing assessments on someone who is unable to pay (*id.*

---

*Dandridge v. Williams* (1970) 397 U.S. 471, 520–521 (dis. opn. of Marshall, J.).) Depending on the "importance of the interests being affected and the relevance of personal wealth to those interests" (*Rodriguez*, *supra*, at p. 122 (dis. opn. of Marshall, J.)), Justice Marshall took the view that "[p]ersonal poverty may entail much the same social stigma as historically attached to certain racial or ethnic groups." (*Id.* at p. 121.)

at p. 1168) should be given any weight at all in evaluating the individual interest.

One of the main lines of criticism of *Dueñas* is that it went "beyond its foundations" (*Hicks*, *supra*, 40 Cal.App.5th at p. 327) by applying *Griffin* outside the context of jailing people for failure to pay fines or depriving them of access to court. (*People v. Gutierrez* (2019) 35 Cal.App.5th 1027, 1039 (conc. opn. of Benke, Acting P. J.).) But that misreads *Griffin*, which enunciates a simple equal protection principle (*People v. Reese*, *supra*, 2 Cal.5th at p. 665) that was long ago extended beyond the context of access to justice, in both criminal and civil cases. (*Jones v. Governor of Florida* (11th Cir. 2020) 950 F.3d 795, 818 ["whether sounding in equal protection or due process, *Griffin*'s equality principle is straightforward: the state may not treat criminal defendants more harshly on account of their poverty"].)

*Mayer v. City of Chicago* (1971) 404 U.S. 189, for example, involved an indigent defendant convicted on non-felony charges who received a fine for each offense. (*Id*. at pp. 190–191.) He wished to appeal based on prosecutorial misconduct and insufficient evidence, but could not do so because the state provided free transcripts only for felony cases. (*Ibid*.) The *Mayer* court rejected the city of Chicago's effort to distinguish *Griffin* on the ground that the defendant there was incarcerated. (*Id*. at p. 196.) Also illustrative is *James*, *supra*, 407 U.S. at page 128, the defense fees recoupment case discussed above. Neither incarceration nor access to justice was at stake there. The case concerned, purely and simply, "squalid discrimination" (*Griffin*, *supra*, 351 U.S. at p. 24 (conc. opn. of Frankfurter, J.)) against indigent criminal defendants for no reason but their poverty. (*See Johnson v. Bredesen* (6th Cir. 2010) 624 F.3d 742, 749 [recognizing that the *James* court was "concerned about discriminatory

15

garnishment of the wages with which a debtor 'supports himself and his family' " and "found that the admittedly 'legitimate' interests of the state paled in comparison to 'the hopes of indigents for self-sufficiency and self-respect' "].)

Nor has the application of *Griffin* been strictly confined to the effects of wealth-based discrimination *within* the criminal justice system.  Courts have been selective in their extension of *Griffin* in the civil context—just as they have been selective in recognizing new "fundamental rights"—but its equal justice principle has been applied in a number of settings where the discriminatory injury at issue was a civil disability having nothing to do with loss of physical liberty (see, e.g., *Boddie v. Connecticut*, *supra*, 401 U.S. 371 [right to seek divorce]; *M.L.B. v. S.L.J.* (1996) 519 U.S. 102 [right to defend against termination of parental rights]) or access to justice (see, e.g., *Harper v. Virginia State Bd. of Elections* (1966) 383 U.S. 663, 668 [relying on *Griffin* in striking down poll taxes]; *Serrano v. Priest* (1971) 5 Cal.3d 584, 598, 602-604, 608-609 (*Serrano I*) [relying on *Griffin* to support the holding that wealth is a suspect classification, while recognizing education as a fundamental interest]).

*Dueñas* implicitly recognizes that the severity of civil burdens flowing from the court-imposed criminal debt may trigger heightened scrutiny under *Griffin* as a form of wealth discrimination.  There is nothing particularly novel about this reading of *Griffin* and its progeny.  (E.g., *Jones v. Governor of Florida, supra*, 950 F.3d at p. 809 ["heightened scrutiny applies in this case because we are faced with a narrow exception to traditional rational basis review:  the creation of a wealth classification that punishes those genuinely unable to pay fees, fines, and restitution more harshly than those able to pay"].)  In rejecting a broad reading of *Griffin*, the *Hicks* court suggests that,

16

to give some defendants but not others relief for inability to pay amounts to a form of " 'inverse discrimination' " (*Hicks*, *supra*, 40 Cal.App.5th at p. 327, quoting *Williams*, *supra*, 399 U.S. at p. 244), but of course the point of heightened scrutiny in equal protection analysis is to recognize and protect against *invidious* discrimination.  Those with the means to pay who are held to that obligation, while others are not, suffer no such discrimination.

The factual premises on which the *Dueñas* court relied have been well-documented.  What *Hicks* dismisses as "language found in . . . dicta" in *Rivera v. Orange Cnty. Probation Department* (9th Cir. 2016) 832 F.3d 1103, 1112, footnote 7 (discussing the "debt trap" that court-imposed fees and fines can lay for indigent populations) and *People v. Neal* (2018) 29 Cal.App.5th 820, 827–828 (describing how court-imposed debt creates a "significant barrier for individuals seeking to rebuild their lives after a criminal conviction") (*Hicks*, *supra*, 40 Cal.App.5th at p. 328) is broadly supported by a number of judicial opinions,[8] reports from blue chip judicial reform study

---

[8] E.g., *Jones v. Governor of Florida*, *supra*, 950 F.3d 795; *Cain v. White* (5th Cir. 2019) 937 F.3d 446, 450; *Commonwealth v. Henry* (Mass. 2016) 55 N.E.3d 943, 950–951; *State v. Blazina* (Wash. 2015) 344 P.3d 680, 684; *People v. Love* (Ill. 1997) 687 N.E.2d 32, 35–36; see Fernandes et al., *Monetary Sanctions:  A Review of Revenue Generation, Legal Challenges, and Reform* (2019) 15 Ann. Rev. L. & Soc. Sci. 397, 411.

groups,[9] publications from research centers at leading universities,[10] and a rich field of published work by individual scholars in diverse fields,[11] all focusing on a growing national trend in criminal courts of using fees and assessments for court funding,[12] and the recognized need to address the disproportionate impact these charges have on low-income populations and minority communities.[13] "[O]ur Chief Justice underscored the urgency of this issue in her 2019 State of the Judiciary address, stating that we 'must ensure

---

[9] Commission on the Future of California's Court System, Judicial Branch of California, Report to the Chief Justice (2017) (Futures Commission Report) Recommendation 2.3:  Refine the Adjudication and Settlement of Fines, Fees, and Assessments, pages 71–84; National Task Force on Fines, Fees and Bail Practices, National Center for State Courts, *Principles on Fines, Fees and Bail Practices* (Dec. 2017) <https://www.ncsc.org/~/media/ Files/PDF/Topics/Fines%20and%20Fees/Principles%201%2017%2019.ashx> (accessed March 27, 2020); Beckett et al., Washington State Minority & Justice Commission, The Assessment and Consequences of Legal Financial Obligations in Washington State (Aug. 1, 2008) (Assessment & Consequences of LFOs).

[10] The Arthur Liman Center for Public Interest Law, Twenty-First Annual Colloquium, Yale Law School, Who Pays?  Fines, Fees, Bail, and the Cost of Courts (April 5–6, 2018); Criminal Justice Program, Harvard Law School, Confronting Criminal Justice Debt:  A Guide for Policy Reform (2016).

[11] E.g., Colgan, *Fines, Fees and Forfeitures* (2017) 18 Criminology, Crim. Just. L. & Soc'y 22, 23 (*Fines, Fees and Forfeitures*) (summarizing scholarship from "a variety of fields, including law, sociology, economics and criminology"); Birckhead, *The New Peonage* (2015) 72 Wash. & Lee L.Rev. 1595, 1602–1605; Harris, A Pound of Flesh:  Monetary Sanctions as Punishment for the Poor (2010).

[12] *Cota, supra*, 45 Cal.App.5th at page 796 (conc. & dis. opn. of Dato, J.).

[13] Futures Commission Report, *supra*, Appendix 2.3C:  Recent Developments Regarding Fines and Fees, page 83, footnote 6 (quoting September 2016 press release by Office of Justice Programs, United States Department of Justice).

18

. . . fines and fees no longer fall on those least able to afford them.' [Citation.] Echoing her concerns, the Administrative Director of California's Judicial Council has remarked that fines and fees create a 'destitution pipeline.' " (*Cota, supra*, 45 Cal.App.5th at p. 798 (conc. & dis. opn. of Dato, J.).) Our Legislature has been focused upon this difficult set of issues for several years.[14] The issue at hand is not the wisdom or adequacy of the limited steps the Legislature has taken so far to deal with it, but more narrowly whether the imposition of mandatory assessments without an ability-to-pay determination is constitutional.

In addressing this issue, I accept some widely acknowledged realities. In our complex scheme of criminal fees and fines, what may appear in isolation to be tiny amounts are in fact just the foundation for the imposition of much larger amounts. Thus, court-imposed debt, even in small amounts, may threaten an indigent person's means of subsistence[15] when penalties, interest and collections costs flowing from default are considered. In addition to blocking access to early probation termination and hindering eligibility for expungement,[16] delinquency on court-ordered debt may diminish prospects

---

[14] Judicial Council of California, Report on the Statewide Collection of Delinquent Court-Ordered Debt for 2018–2019 (Dec. 2019) (2019 Judicial Council Delinquent Debt Report), page 2.

[15] *Challenging the Modern Debtors' Prison, supra*, 65 UCLA L.Rev. at page 10 ("[a]s one person struggling to pay explained, even '$10 doesn't sound like a lot, but it is a lot when you are living on $300 a month,' " quoting Assessment & Consequences of LFOs, *supra*, p. 36).

[16] *Dueñas, supra*, 30 Cal.App.5th at page 1171 ("In this statutory scheme, . . . the wealthy defendant is offered an ultimate outcome that the indigent one will never be able to obtain—the successful completion of all the terms of probation and the resultant absolute right to relief from the conviction, charges, penalties, and disabilities of the offense. At best, indigent defendants who cannot pay their restitution fine can try to persuade

for employment and housing,[17] disqualify the debtor from government benefits and professional licenses,[18] put public housing out of reach,[19] and create incentives to obtain money by illegal means, thus working at cross-purposes with the rehabilitative goals of criminal sentencing, probation, and reentry.[20]  And because court-ordered debt is not subject to any statute of limitations[21] and not dischargeable in bankruptcy,[22] the consequences can last a lifetime, effectively resulting in what amounts to perpetual punishment.  Velia Dueñas's case provides a particularly vivid example of these "cascading consequences." (*Dueñas*, *supra*, 30 Cal.App.5th at p. 1163; see *id.* at pp. 1161–1163.)  I agree that the facts there may be considered "extreme" (*People v. Caceres* (2019) 39 Cal.App.5th 917, 923), but I am not convinced they are unusual, given the close association between crime, mental illness, and chronic drug addiction.

In light of these realities, I think the courts declaring *Dueñas* to have been wrongly decided not only fail to appreciate the rigor of *Bearden*'s balancing test, but adopt too narrow a conception of due process as its procedural protections have been "worked out over many decades of constitutional litigation." (*Randone v. Appellate Dept. of Superior Court* (1971) 5 Cal.3d 536, 548–549.)  It requires no "alteration of principles of due

a trial court to exercise its discretion to grant them relief, despite their failure to comply with all terms of probation").

[17] *Fines, Fees and Forfeitures*, *supra*, at page 25.

[18] *Ibid.*

[19] *Ibid.*

[20] *Ibid.*

[21] Penal Code section 1214, subdivision (e)(1)–(2).

[22] Title 11 United States Code section 523(a)(7).

process" (*id*. at p. 551) to conclude that, by putting at risk the only "means to obtain essential food, clothing, housing, and medical care" an indigent may have (*Goldberg v. Kelly* (1970) 397 U.S. 254, 264 (*Goldberg*)), the imposition of unpayable court-funding assessments without considering ability to pay exposes the person assessed to summary deprivation of property (i.e., money demanded by the state that would otherwise be used to pay for that person's basic necessities of life).[23]

According to the critics of *Dueñas*, whatever hardships might be brought about by court-ordered debt are unfortunate, but not constitutionally cognizable. The underlying premise is that *Griffin* and its progeny address only deprivations of constitutionally fundamental rights. (See *People v. Santos* (2019) 38 Cal.App.5th 923, 937–938 (dis. opn. of Elia, J.) ["*Dueñas* did not involve the right to access the courts, the defendant's liberty interests, or any other fundamental right"].) But what these critics overlook is that there *is* a fundamental right at stake here—the right to be free from constitutionally excessive fines. (*Timbs v. Indiana* (2019) ___ U.S. ___

---

[23] *Goldberg*, *supra*, 397 U.S. at page 262, footnote 8 (citing Reich, *Individual Rights and Social Welfare: The Emerging Legal Issues* (1965) 74 Yale L.J. 1245, 1255; Reich, *The New Property* (1964) 73 Yale L.J. 733). My focus here is on federal due process standards, but it bears noting that as a matter of due process under the California Constitution (Cal. Const., art. I, §§ 7, subd. (a), 15), we eschew the question whether there is some entitlement "that can be defined as 'liberty' or 'property,' " and instead ask more broadly "what procedural protections are constitutionally required in light of the governmental and private interests at stake." (*People v. Ramirez* (1979) 25 Cal.3d 260, 264 (plur. opn. of Mosk, J.) (*Ramirez*).) We do so because "[t]he federal approach . . . undervalues the important due process interest in recognizing the dignity and worth of the individual by treating him as an equal, fully participating and responsible member of society" (*id*. at p. 267), which is precisely what is at stake here on the private interest side of the balance.

[139 S.Ct. 682, 689] (*Timbs*).) Thus, even assuming it is correct that *Bearden* applies only to deprivations so serious as to be deemed constitutionally fundamental, we have a threatened deprivation of that magnitude here, which triggers the *Bearden* test.

Because all of the opinions criticizing the due process analysis in *Dueñas* dismiss the burdens of unpayable debt as constitutionally insignificant, none of them actually carries out the weighing process required by *Bearden*. The *Hicks* court does, however, provide a sketch of the competing interests before declaring the proper balance to be a matter for the legislative domain. It acknowledges, on the one hand, the importance of fair and evenhanded treatment of "criminal defendants, many of whom are people of little or no means," and, on the other, the state's interest in generating revenue to "help defray the costs of operating the court system" and for programmatic victim restitution. (*Hicks*, *supra*, 40 Cal.App.5th at p. 328.) According to the *Hicks* court, the holding in *Dueñas* grants a form of "immunity," which not only "relieves the indigent probationer of any duty to make any effort to repay his debts and thereby rehabilitate himself" (*Hicks*, *supra*, 40 Cal.App.5th at pp. 327–328), but "is . . . inconsistent with the operation of probation," since probation "typically lasts a number of years . . . and thus gives probationers a significant period of time to repay their financial obligations" by their bona fide efforts or a change in their circumstances. (*Ibid.*)

Respectfully, I fail to see how *Dueñas* grants an "immunity." The rule laid down there requires an individualized showing of indigency. Correctly understood and applied, this is not an automatic exemption. It applies only to a sub-population of indigent criminal defendants who we know are certain to default the moment an assessment is imposed, with a perpetual cycle of

22

ever mounting, unescapable debt to follow.  These defendants have no ability to demonstrate their rehabilitation through financial accountability; no ability to contribute anything to court funding; and no reasonable prospects for any change in circumstance.  For them, like Sisyphus, extended time to pay means only condemnation to a task that can never be achieved.  The odious history of debt peonage in this country may seem foreign to us—it is associated with race discrimination and economic oppression in other states, in a bygone era—but before looking the other way here, we should consider the echoes of that regime in our system of criminal justice "user fees."

While Government Code section 70373 and Penal Code section 1465.8 are silent on the issue of whether a court must consider a defendant's ability to pay, the *Dueñas* court reads these provisions to require it for those who, through no fault of their own, face unpayable assessments.  Normally, courts "may not make a silent statute speak by inserting language the Legislature did not put in the legislation" (*Yeager v. Blue Cross of California* (2009) 175 Cal.App.4th 1098, 1103), but I do not share the view that *Dueñas* rewrote Government Code section 70373 and Penal Code section 1465.8 "by judicial fiat." (*People v. Gutierrez*, *supra*, 35 Cal.App.5th at p. 1038 (conc. opn. of Benke, Acting P. J.).)  There is a substantial constitutional question here, at least.  Whether *Dueñas*'s holding with respect to the assessment statutes is read to rest on constitutional grounds (violation of due process) or on statutory grounds (the statutes must be read in pari materia with civil fee imposition statutes affording in forma pauperis relief to indigents),[24] I believe

---

[24] The concluding citation in the assessments section of the *Dueñas* opinion to *Jameson v. Desta* (2018) 5 Cal.5th 594, 622, a statutory interpretation case (*id.* at p. 599), suggests the latter. (*Dueñas*, *supra*, 30 Cal.App.5th at p. 1169.)

23

its conclusion is right either way—as a federal constitutional matter under *Bearden*, or as a statutory matter under the rule that, where possible, we interpret statutes to preserve their constitutionality.[25]  Certainly, I see no need to reject the Attorney General's concession on the point.  Coming from the chief law enforcement officer in the state, that concession deserves respectful consideration in our constitutional calculus.[26]

## II.  STATE LAW

Although in my view, the assessments at issue in this case do not survive constitutional scrutiny under either the federal equal protection or due process clauses, the restitution fine is another matter.  I do not doubt that, if evaluated under rational basis review, the imposition of a mandatory minimum restitution fine under Penal Code section 1202.4 on all convicted criminal defendants, without consideration of ability to pay, is constitutionally valid and enforceable.  Where any rationally conceivable justification will suffice, the state is free to "use[ ] a shotgun instead of a rifle to accomplish its legitimate end."  (*Johnson v. Bredesen*, *supra*, 624 F.3d at p. 748.)  *Bearden* interest balancing presents a closer question, but in the end, because the burden remains with the challenger under that more

---

[25] *California Housing Finance Agency v. Elliott* (1976) 17 Cal.3d 575, 594; see *Syrek v. California Unemployment Ins. Appeals Bd.* (1960) 54 Cal.2d 519, 526 (" 'The power of a court to declare a statute unconstitutional is an ultimate power; its use should be avoided if a reasonable statutory construction makes the use unnecessary,' " citing *Ashwander v. Tennessee Valley Authority* (1936) 297 U.S. 288, 346 (conc. opn. of Brandeis, J.)).

[26] Cf. *D'Amico v. Board of Medical Examiners* (1974) 11 Cal.3d 1, 15–16 (accepting concession by the Attorney General made in the course of discharging his "paramount duty to represent the public interest" on the ultimate "constitutional fact" that the challenged enactment bore no rational relationship to its legislative objective).

exacting test, I think the state must still prevail.  There may be some overbreadth in the statute, but it serves an important penological purpose, even if some defendants are so poor that they lack the ability to respond to the rehabilitative objective of the fine by paying it.  Regardless of any given individual defendant's ability to pay, the imposition of an automatic fine across the board—with no exceptions—sends a deterrent and retributive message.  The Legislature enjoys the prerogative of weighing the importance of sending such a message in absolute, unqualified terms.[27]  This is, in

[27] Assuming rational basis review or *Bearden* interest balancing applies, that is a sufficient justification to uphold the validity of Penal Code section 1202.4.  To illustrate another type of policy concern specific to restitution fines that should properly be weighed by the Legislature, not the courts, as a counterbalance to any concern for imposing unpayable debt on indigents, the *Hicks* court suggests that the holding in *Dueñas* "significantly undercuts the statewide Restitution Fund (§ 1202.4, subd. (e))," and thus potentially calls into question the state's ability "to continue providing some measure of restitution and solace to . . . crime victims[.]"  (*Hicks, supra,* 40 Cal.App.5th at p. 329.)

I see no need to venture into any of this for a justification.  Worthy as the point is in the abstract, its premise is flawed when the scheme for distributing revenues generated by criminal fines and fees is taken into account.  Total criminal fines and fees collected every year are distributed to over 50 state funds (including the statewide restitution fund) in addition to many local funds.  (Legislative Analyst's Office Report, Improving California's Criminal Fine and Fee System (Jan. 2016) p. 8.)  The revenue sources for these funds are governed by a complex formula for distribution among the funds (*id.* at pp. 8–10), and within that distribution formula victim restitution has first priority (*id.* at p. 12, figure 6; see also Legislative Analyst's Office Report, Restructuring the Court-Ordered Debt Collection Process (Nov. 2014) pp. 8, 12, figure 5).  Because of this favored status, it does not follow that for every dollar in reduced restitution fine revenue resulting from consideration of inability to pay, there will be a reduction in revenue going to the restitution fund, much less one that would "significantly undercut[ ]" the fund.  (*Hicks, supra,* 40 Cal.App.5th at p. 329.)

essence, the point of view advanced by the Attorney General, and I do not disagree with him, at least as a federal constitutional matter.

But it is here, I think, that California's state equal protection guarantee—which is broader than its federal counterpart—makes a crucial difference. It is well established that our state charter is a document of "independent force." (*People v. Buza* (2018) 4 Cal.5th 658, 684; *Raven v. Deukmejian* (1990) 52 Cal.3d 336, 352; see also *Serrano v. Priest* (1976) 18 Cal.3d 728, 764 (*Serrano II*).) My preference would be to address and resolve all of the constitutional issues presented here—with regard to the assessments as well as the restitution fine—as an equal protection matter under article I, section 7, and article IV, section 16 of the California Constitution. We in the California judiciary have a long history of taking independent steps on pressing issues of the day, most commonly in discrimination cases.[28] The deeper inquiry into California constitutional law

---

I grant the possibility, to be sure, that this supposition about undercutting the victim restitution fund is the kind of " ' " 'rational speculation' " ' " that might suffice to justify a discriminatory legislative classification under the rational basis test. (*Johnson v. Department of Justice* (2015) 60 Cal.4th 871, 881.) While I am inclined to think it fails to meet even that test because it "completely ignore[s]" the "realities of the subject matter" (*ibid.*), I do think that, at the very least, the issue illustrates the importance of who bears the burden of proof.

[28] In addition to *Serrano II*, *supra*, 18 Cal.3d 728, see *In re Marriage Cases* (2008) 43 Cal.4th 757, 837–838 (same-sex marriage); *Perez v. Sharp* (1948) 32 Cal.2d 711, 715–718 (plur. opn. of Traynor, J.) (interracial marriage); *People v. Wheeler* (1978) 22 Cal.3d 258, 284–286 (racially motivated peremptory challenges in jury selection); see also *Ramirez*, *supra*, 25 Cal.3d at pages 264–269 (plur. opn. of Mosk, J.) (procedural due process; eligibility for drug rehabilitation treatment rather than imprisonment); *People v. Brisendine* (1975) 13 Cal.3d 528, 548–551 (search and seizure; scope of search incident to arrest); *People v. Cahan* (1955) 44 Cal.2d 434, 447–451 (search and seizure; exclusionary rule).

not only probes directly into what is at issue—the disparate impact of these assessments and fines on the poor (see *People v. Santos, supra,* 38 Cal.App.5th at p. 939 (dis. opn. of Elia, J.))—but at the same time elevates the standard of review to strict scrutiny, thus answering one of the principal criticisms of *Dueñas.* (See *People v. Lowery* (2020) 43 Cal.App.5th 1046, 1057, fn. 15 [*Dueñas* "neither articulated what fundamental liberty interest was at stake nor set forth a standard of review"].)

Where strict scrutiny applies, " ' " ' "*the state* bears the burden of establishing not only that it has a *compelling* interest which justifies the law but that the distinctions drawn by the law are *necessary* to further its purpose." ' " ' " (*In re Marriage Cases, supra,* 43 Cal.4th at p. 832, italics in original; see *Serrano II, supra,* 18 Cal.3d at p. 761.) This heightened standard of review applies "when the 'distinction drawn by a statute rests upon a so-called "suspect classification" or impinges upon a fundamental right.' " (*Vergara, supra,* 246 Cal.App.4th at p. 645.) Essentially adopting the dissenting view in *Rodriguez* (see, *ante,* fn. 7; *Rodriguez, supra,* 411 U.S. at pp. 98–99 (dis. opn. of Marshall, J.)), the *Serrano II* court held that under the California Constitution, wealth is a suspect classification for equal protection purposes when combined with infringement of a fundamental right. (*Serrano II, supra,* at p. 768; *Serrano I, supra,* 5 Cal.3d at pp. 597–598.)[29]

---

[29] Notably, in recognizing wealth as a suspect class, *Serrano I* relied on *Griffin* (*Serrano I, supra,* 5 Cal.3d at p. 604 [wealth classifications have been previously recognized in cases involving the "rights of defendants in criminal cases"]), while *Rodriguez* distinguished it (*Rodriguez, supra,* 411 U.S. at pp. 20–21; see also *id.* at p. 25 [rejecting claim that a cognizable class of " 'poor' people" can be defined for equal protection purposes since poverty exists "along a continuum"]; *Bearden, supra,* 461 U.S. at p. 666, fn. 8 ["a

27

We have both in this case. Penal Code section 1202.4, on its face, discriminates based on poverty. Subdivision (b) of that section provides that, "[i]n every case where a person is convicted of a crime, the court shall impose a separate and additional fine, unless it finds compelling and extraordinary reasons for not doing so and states those reasons on the record." And under subdivision (c), a defendant's "[i]nability to pay may be considered . . . in increasing the amount of the restitution fine in excess of the minimum."[30] My particular concern is the caveat in subdivision (c) providing that inability to pay "shall not be considered a compelling and extraordinary reason not to impose a restitution fine." By that caveat, the Legislature has expressly withdrawn a defense to the imposition of a minimum fine for the only group of people who need it—those lacking the ability to pay. Thus, it discriminates based on impecuniousness not merely by disparate impact, but on its face.

The assessment statutes, Government Code section 70373 and Penal Code section 1465.8, may also be analyzed under article I, section 7 and article IV, section 16 of the California Constitution. Under our state equal protection guarantee, laws that " ' "discriminate explicitly between groups of people," ' " as well as laws that, " ' "though evenhanded on their face, in operation have a disproportionate impact on certain groups," ' " are subject to equal protection scrutiny. (*Vergara, supra*, 246 Cal.App.4th at p. 644.) The two assessment statutes at issue apply in the same way to rich and poor alike and thus are facially neutral. But at bottom, the problem *Dueñas* spotlights is the sheer arbitrariness of imposing court-funding assessments on convicted

---

defendant's level of financial resources is a point on a spectrum rather than a classification"]).

[30] The fine must be set in a range from a minimum of $300 to a maximum of $10,000, for a felony, and a range of $150 to $1,000, for a misdemeanor. (Pen. Code, § 1202.4, subd. (b)(1).)

28

criminal defendants without inquiring into ability to pay, which has the effect of adding punishment for some defendants depending on the accident of their relative poverty.  The disparate impact on those who cannot pay is, in my view, cognizable as a matter of equal protection under state equal protection principles.

"[T]o me, singling out the poor to bear a burden not placed on any other class of citizens tramples the values that the Fourteenth Amendment was designed to protect."  (*James v. Valtierra* (1971) 402 U.S. 137, 145 (dis. opn. of Marshall, J.).)[31]  In a closely divided five to four decision, the United States Supreme Court turned away from this point of view as a matter of federal law in *Rodriguez*, *supra*, 411 U.S. at pages 18–29, but the California Supreme Court embraced it as a matter of state law in *Serrano II*, *supra*, 18 Cal.3d at pages 761–766.  While the textbook version of equal protection law that is taught to this day in law schools nationwide takes *Rodriguez* as settled doctrine, which is correct and understandable for courses taught from the standpoint of national law, it is not often remembered that *Serrano II* charted a different course under the California Constitution.  We would break no new ground in applying *Serrano II* here.

In that pivotal case, our Supreme Court—squarely faced with the choice of following *Rodriguez* in lockstep under the California Constitution— chose its own path after giving " 'respectful consideration' " (*People v. Buza*, *supra*, 4 Cal.5th at p. 684) to the then-recent opinion in *Rodriguez*.  "[T]he fact that a majority of the United States Supreme Court [chose] . . . to contract the area of active and critical analysis under the strict scrutiny test for federal constitutional purposes can have no effect upon the existing

---

[31] See Foner, The Second Founding:  How the Civil War and Reconstruction Remade the Constitution (2019) page 78.

29

construction and application afforded our own constitutional provisions" in a wealth discrimination case where fundamental interests are at stake, the court declared. (*Serrano II, supra,* 18 Cal.3d at p. 765.) So far as I know, that remains the law in our state. Until otherwise instructed by the California Supreme Court, I see no reason to confine *Serrano II* to its facts or to depart from the principle of law announced in that case, which is essentially the *Griffin* equal justice principle applied in the context of fundamental civil rights.

I have already identified the fundamental civil right at stake here—the right to be free from excessive fines. To determine whether an individual right or interest is so firmly rooted under California law as to be recognized as fundamental, we must look first to "the treatment afforded particular rights and interests by the provisions of our state Constitution," a consideration that must be "accorded significant consideration," though not "conclusive weight." (*Serrano II, supra*, 18 Cal.3d at p. 768, fn. 48.) Under article I, section 17 of the California Constitution, "Cruel or unusual punishment may not be inflicted or excessive fines imposed." Even more significantly, as noted above, in *Timbs, supra*, ___ U.S. at p. ___ [139 S.Ct. at p. 689], the United States Supreme Court recently found the excessive fines clause of the Eighth Amendment to be so " 'fundamental to our scheme of ordered liberty' " that it warrants application to the states through the due process clause of the Fourteenth Amendment.

Recognizing that we are dealing with wealth-based discrimination and that the discrimination affects a fundamental right, the question becomes whether the failure to inquire into ability to pay burdens this right in a manner that triggers strict scrutiny. Or, to frame the issue more specifically in the language of California fundamental rights cases, does Penal Code

section 1202.4 have a "real and appreciable impact on" the right or "significantly interfere[ ] with" it? (*Vannier v. Superior Court* (1982) 32 Cal.3d 163, 171 (*Vannier*).) This is a different question than whether it is possible to say, on this record, the right has been violated. "When a statutory classification impinges a fundamental right (and does not involve a suspect classification), strict scrutiny will apply unless the effect on the fundamental right is merely 'incidental,' 'marginal,' or 'minimal.' " (*Vergara, supra*, 246 Cal.App.4th at p. 645.)

As the lead opinion explains, because the right to be free from excessive fines applies at the moment a fine is imposed, the conclusion seems to me unavoidable that all three of the challenged statutes at issue here have a "real and appreciable impact" (*Vannier*, *supra*, 32 Cal.3d at p. 171) on the ability of indigent defendants to assert this fundamental right. (*Vergara*, *supra*, 246 Cal.App.4th at p. 640.) That is because, for the right to provide meaningful protection, an ability-to-pay inquiry must take place and an adequate record must be made *before* an assessment or fine is imposed. To bar a sentencing court from taking ability to pay into account in imposing the fine creates an obstacle to asserting the right to avoid its imposition. The question of excessiveness cannot be meaningfully evaluated in the trial court or on appeal unless the defendant has a right to object and make a record on the issue of ability to pay, before suffering the assessment or fine.

At the final, strict scrutiny step in the analysis, the state bears the heavy burden of demonstrating that the challenged infringement of a fundamental right is justified by a compelling state interest and may not be carried out any other way. (*In re Marriage Cases*, *supra*, 43 Cal.4th at p. 832; *Serrano II, supra*, 18 Cal.3d at p. 761.) The Attorney General has not attempted to meet that burden, other than to suggest that the imposition of

mandatory minimum fines under Penal Code section 1202.4 serves to punish, in addition to promoting rehabilitation and deterrence. True enough, but since all defendants are permitted to interpose inability-to-pay objections as a basis to argue against the amount of a restitution fine above the minimum, I see no compelling reason why the same objection may not be made available to defendants who wish to argue against the imposition of a minimum fine on that basis, without sacrificing any clarity of purpose or significantly undermining the effectiveness of the state's penological objectives.

## III. CONCLUSION

"Criminal fines and fees in California are among the highest in the country."[32] The inability of many defendants "to satisfy court-ordered debt is reflected in the large amount of outstanding debt and the courts' inability to collect it"[33]—total delinquencies stood at $10.581 billion as of fiscal year-end 2019,[34] of which $1.32 billion has been written off as uncollectible since 2012[35]—and the disparate impact of these massive delinquencies on low-income populations and minority communities has been acknowledged as a matter of concern by the Chief Justice of California, by the Administrative Director of our Judicial Council, as well as by the United States Department of Justice.[36]

---

[32] Futures Commission Report, *supra*, page 71.

[33] *Id.* at page 75.

[34] 2019 Judicial Council Delinquent Debt Report, *supra*, chart 6: Outstanding Court-Ordered Debt 2008–09 through 2018–19, page 8.

[35] *Id.* at chart 5: Outstanding Balance Discharged from Accountability 2012–13 through 2018–19, page 7.

[36] *Cota*, *supra*, 45 Cal.App.5th at p. 798 (conc. & dis. opn. of Dato, J.); 2019 Judicial Council Delinquent Debt Report, page 2; Futures Commission Report, *supra*, Appendix 2.3C: Recent Developments Regarding Fines and Fees, page 83 and footnote 6.

Against this backdrop, it is tempting to dismiss the relatively small amounts of court-imposed debt in this case as de minimis, but we should bear in mind that while the specific amounts at issue are small, the size of a single fine or fee is not an accurate indicator of its impact within a given case or on a given defendant.  Under our complex system of criminal fines and fees, which has been aptly likened to the tax code (*People v. Castellanos* (2009) 175 Cal.App.4th 1524, 1533 (conc. opn. of Kriegler, J.)), what may appear at first blush to be small financial charges are often, in practice, simply the foundational blocks on which additional layers of mandatory penalty assessments are imposed, resulting in debt that can easily run into the thousands of dollars before default charges begin to mount.

Because this system of criminal fines and fees—with its enormous overhang of uncollectible debt—presents fairness and equity issues that are, in many respects, peculiar to our state, I believe we should look to the California Constitution as the fulcrum of analysis here, building from federal standards but without yoking ourselves to them.[37]  Proceeding solely under state law, I would adopt the lead opinion's excessive fines analysis and reach the same disposition it does, while placing that analysis within the overall

---

[37] E.g., *Ramirez, supra,* 25 Cal.3d at page 265 (plur. opn. of Mosk, J.) (setting forth due process standards under article I, section 7, subdivision (a), and section 15 of the California Constitution in an analysis beginning with United States Supreme Court cases decided under counterpart federal standards but concluding that "[t]he reasoning of such cases . . . requires some refinement in order to determine the appropriate standards for invoking the state [due process] clauses"); see Sutton, 51 Imperfect Solutions: States and the Making of American Constitutional Law (2018) pages 174–190 (making the case for "judicial federalism" as a mode of constitutional decision making in which state courts make greater use of their own state constitutions than they traditionally have done).

framework of California's equal protection guarantee.  To date, excessive fines objections have been entertained in published California appellate cases only in the civil context and only in commercial litigation, generally for corporate entities.[38]  I suspect no one would dispute that the right to be free from excessive fines should be available to natural persons as well.  The equal protection guarantee, as we understand and apply it in California, makes clear that it extends to all persons, rich and poor alike.

Regardless of the mode of analysis, however, the bottom line for me is this:  We, and our colleagues in *Dueñas*, using different analytical approaches, have recognized a constitutionally compelled "safety net" that is available to a sub-population of indigent criminal defendants who, through no fault of their own, face monetary sanctions they will never be able to pay.  Imposing such sanctions without the "safety net" we have recognized, as I see it, is a form of mindless cruelty comparable to the treatment of Josef K. in Kafka's The Trial.  I cannot accept the view that we are powerless to address it, whether proceeding under the excessive fines analysis set out in the lead opinion, a federal equal protection or federal due process analysis, or preferably—looking to the California Constitution—through the framework of equal protection under state law, while folding an excessive fines analysis within it.

STREETER, J.

---

[38] *Lockyer v. R.J. Reynolds Tobacco Co.* (2005) 37 Cal.4th 707; *People v. Overstock.com, Inc.* (2017) 12 Cal.App.5th 1064; *People ex rel. State Air Resources Bd. v. Wilmshurst* (1999) 68 Cal.App.4th 1332; *City and County of San Francisco v. Sainez* (2000) 77 Cal.App.4th 1302; cf. *Adams v. Murakami* (1991) 54 Cal.3d 105 (civil award of punitive damages may not be sustained absent proof of defendant's financial condition).

Trial Court:              City & County of San Francisco Superior Court

Trial Judge:              Hon. Ethan Schulman

Counsel for Appellant:    Theresa Osterman Stevenson,
                          by appointment of the First District Court of Appeal
                          under the First District Appellate Project

Counsel for Respondent:   Xavier Becerra, Attorney General
                          Jeffrey M. Laurence, Sr. Asst. Attorney General
                          René A. Chacón, Supervising Deputy Attorney General
                          Bruce Ortega, Deputy Attorney General

*People v. Cowan* (A156253)